JS 44 (Rev. 11/15)

# CIVIL COVER SHEET

County in which action arose: Wayne

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

CITY OF LIVONIA EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,

**DEFENDANTS**

TALMER BANCORP, INC., et al (see attachment for additional defendants)

**(b)** County of Residence of First Listed Plaintiff   Wayne
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
David J. Shea - SHEA AIELLO, PLLC
26100 Amerian Drive, 2nd Floor
Southfield, Michigan 48034   248-354-0224

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☒ 3  Federal Question *(U.S. Government Not a Party)* |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729 (a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights ☐ 830 Patent | ☐ 430 Banks and Banking ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 840 Trademark | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) ☐ 862 Black Lung (923) | ☐ 480 Consumer Credit ☐ 490 Cable/Sat TV |
| ☒ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending ☐ 380 Other Personal | ☐ 720 Labor/Management Relations | ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | | ☐ 891 Agricultural Acts ☐ 893 Environmental Matters |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | | ☐ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities Other | **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application ☐ 465 Other Immigration Actions | | |
| | ☐ 448 Education | ☐ 550 Civil Rights ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from Another District *(specify)*   ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. §1331 and §27 of the 1934 Act, 15 U.S.C. §78aa
Brief description of cause:
Shareholder Derivative Class Action

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE   see attachment   DOCKET NUMBER   see attachment

DATE
June 16, 2016

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

## PURSUANT TO LOCAL RULE 83.11

1.      Is this a case that has been previously dismissed?          ☐ Yes
                                                                     ☒ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____


2.      Other than stated above, are there any pending or previously
        discontinued or dismissed companion cases in this or any other      ☒ Yes
        court, including state court? (Companion cases are matters in which  ☐ No
        it appears substantially similar evidence will be offered or the same
        or related parties are present and the cases arise out of the same
        transaction or occurrence.)

If yes, give the following information:

Court:  see attachment_____

Case No.: _____

Judge: _____


Notes :

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF MICHIGAN

City of Livonia Employees' Retirement System v. Talmer Bancorp, Inc. et al
Attachment to Civil Cover Sheet

*I.      Defendants*

The following are listed as Defendants in the foregoing complaint:

Talmer Bancorp, Inc.
Chemical Financial Corporation
Gary Torgow
David T. Provost
Gary S. Collins
Max A. Berlin
Jennifer M. Granholm
Paul E. Hodges III
Ronald A. Klein
Barbara J. Mahone
Robert E. Naftaly
Albert W. Papa
Thomas L. Schellenberg
Arthur A. Weiss

*VIII. Related Case(s)*

1:2016-cv-11511
1:2016-cv-11261
1:2016-cv-11482

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| CITY OF LIVONIA EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civ. No. |
| | ) | COMPLAINT FOR VIOLATIONS OF §§14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934 |
| Plaintiff, | ) ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| TALMER BANCORP, INC., CHEMICAL FINANCIAL CORPORATION, GARY TORGOW, DAVID T. PROVOST, GARY S. COLLINS, MAX A. BERLIN, JENNIFER M. GRANHOLM, PAUL E. HODGES III, RONALD A. KLEIN, BARBARA J. MAHONE, ROBERT H. NAFTALY, ALBERT W. PAPA, THOMAS L. SCHELLENBERG and ARTHUR A. WEISS, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | DEMAND FOR JURY TRIAL |

1153040_1

Plaintiff City of Livonia Employees' Retirement System, individually and on behalf of all others similarly situated, by the undersigned counsel, alleges the following based upon information and belief, except for plaintiff's own acts, which are alleged on knowledge, and upon a continuing investigation conducted by and through plaintiff's counsel and retained expert consultant into the facts and circumstances alleged herein, which included, without limitation, review and analyses of: (i) the public filings of Talmer Bancorp, Inc. ("Talmer" or the "Company") and Chemical Financial Corporation ("Chemical") with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases, public statements, analyst reports, news articles and other publications disseminated by or concerning Talmer, Chemical, their respective related entities and the Proposed Acquisition (as defined below); and (iii) the corporate websites of Talmer and Chemical.

## SUMMARY OF THE ACTION

1. Plaintiff brings this shareholder class action individually and on behalf of the other public shareholders of Talmer against Talmer, its Board of Directors (the "Board"), and Chemical for violations of §§14(a) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") against the Individual Defendants and Talmer in connection with the Joint Preliminary Prospectus/Joint Proxy

- 1 -

1153040_1

Statement on Form S-4 filed with the SEC on March 31, 2016 (the "Proxy").  This action arises out of Chemical's efforts to acquire the outstanding common stock of Talmer (the "Proposed Acquisition").

2.     Talmer is headquartered in Troy, Michigan and is the holding company for Talmer Bank and Trust.  On January 25, 2016, Talmer entered into an Agreement and Plan of Merger (the "Merger Agreement") with Chemical. Pursuant to the Merger Agreement Chemical will acquire Talmer by purchasing all of the Company's outstanding shares at a purchase price of just 0.4725 of a share of Chemical common stock and $1.61 in cash for each share of Talmer common stock.  Following the consummation of the Proposed Acquisition, Talmer will be merged with and into Chemical, with Chemical as the surviving corporation (the "Merger").

3.     The Proposed Acquisition is the product of a hopelessly flawed process that is designed to ensure the sale of Talmer to Chemical on terms preferential to defendants and other Talmer insiders and to subvert the interests of plaintiff and the other public stockholders of the Company.   The Proposed Acquisition is being driven by the Company's current Board and management, who collectively hold 13.8% of Talmer's outstanding shares (over 9.1 million shares).  The Board and other company insiders seek liquidity for their illiquid

- 2 -

holdings in Talmer stock, and the Proposed Acquisition offers significant liquidity for their illiquid Talmer shares. Thus Board members are conflicted and serving their own financial interests rather than those of Talmer's other shareholders.

4. Moreover, per the Merger Agreement, each member of the Board and Talmer senior management will have the opportunity (not offered to Talmer's public shareholders) to tender to Talmer up to 25% of such optionholder's options outstanding as of the date of the merger agreement, in exchange for a cash payment, instead of having to accept the uncollared, 90% Chemical stock merger consideration.

5. The Board also selected a conflicted financial advisor, Keefe, Bruyette & Woods, Inc. ("KBW"). First, KBW's fee for its service as the Board's financial advisor is a fee of over $12 million that is wholly contingent on the closing of the Proposed Acquisition. Furthermore, KBW has had long standing and lucrative relationships with both Talmer and Chemical. In the last two years alone, Talmer has paid at least $8 million and Chemical $4.8 million to KBW. Finally during at least 50% of the time that Talmer was in the discussions and negotiations leading to the Proposed Acquisition, KBW was also engaged as a financial advisor to Chemical.

- 3 -

6.     These unresolved and unaddressed conflicts poisoned the process leading to the Proposed Acquisition.  Early on, the Board allowed KBW to pitch Talmer as a merger candidate to Chemical, even though KBW was serving as a financial advisor to Chemical on another deal.  Discussions and negotiations between Talmer and Chemical were conducted by members of management outside the presence of any independent member of the Board.  As a result, the Board and members secured their own special benefits from the transaction, and secured their future with Chemical, but failed to maximize, or even protect, shareholder value.

7.     The Proposed Acquisition price drastically undervalues the Company and its prospects.  First, based on the closing price of Chemical stock the day before the Proposed Acquisition was announced ($29.70), the Proposed Acquisition consideration was valued at just $15.64 per Talmer share.  But the $15.64 value of the Proposed Acquisition consideration: (i) represents a negative premium of 16.4% to, and is almost $3 below Talmer stock's recent, December 29, 2015, market high of $18.71 per share; (ii) is below the 52-week average of $16.26 per share; (iii) offers Talmer shareholders a negative premium of 2.3% from the Company's closing price of $16.00 per share on the day before the Proposed

- 4 -

Acquisition was announced; and (iv) is dramatically lower than analysts' high and median price target of $21.00 per Talmer share.

8.     To protect against the threat of alternate bidders out-bidding Chemical after the announcement, defendants implemented preclusive deal protection devices to guarantee that Chemical will not lose its preferred position. First, pursuant to the Merger Agreement, Talmer will hold a shareholder vote on the Proposed Acquisition. The closing of the Merger is subject only to an affirmative vote by the holders of a simple majority of the Company's common stock. Each of the Company's directors – who collectively hold almost 13% of Talmer's common stock – has entered into a support agreement with Chemical, in which each director agrees to vote in favor of the Proposed Acquisition and against any alternative offer to acquire Talmer. Thus fewer than 38% of Talmer's shareholders need to vote in favor of the Proposed Acquisition for it to close.

9.     In addition, defendants agreed to specific deal protection devices which effectively preclude *any* competing bids for Talmer. Those deal protection devices will preclude a fair sales process for the Company and lock out competing bidders, and include:

(a)     a "no-solicitation" or "no-shop" provision that precludes Talmer from providing confidential Company information to, or even

- 5 -

communicating with, potential competing bidders for the Company except under very limited circumstances;

(b)   an illusory "fiduciary out" for the no-shop provision that requires the Company to provide Chemical with advance notice before providing any competing bidder with any confidential Company information, even after the Board has determined that the competing bid is reasonably likely to lead to a superior proposal and that the Board would breach fiduciary duties by not providing the competing bidder with confidential Company information;

(c)   an "information rights" provision that requires the Company to provide Chemical with confidential, non-public information about competing proposals which Chemical can then use to formulate a matching bid;

(d)   a "matching rights" provision that requires Talmer to provide Chemical with the opportunity to match any competing proposal; and

(e)   a termination and expense fee provision that requires the Company to pay Chemical $34 million if the Proposed Acquisition is terminated in favor of a superior proposal.

10.   The support agreements and the deal protection devices prelude a fair sales process for Talmer's shareholders and make the Proposed Acquisition a virtual *fait accompli*.

- 6 -

11.    To make matters worse, and in an attempt to secure shareholder support for the unfair Proposed Acquisition, on March 31, 2016, defendants caused Talmer and Chemical to file a Joint Preliminary Prospectus/Joint Proxy Statement on Form S-4 (the "Proxy"), which recommends that Talmer stockholders vote in favor of the Proposed Acquisition, omits and/or misrepresents material information about the unfair sales process for the Company, conflicts of interest that corrupted the sales process, the unfair consideration offered in the Proposed Acquisition, the actual intrinsic value of the Company on a stand-alone basis and as to be acquired by Chemical, and the data, inputs and assumptions the Company's financial advisor, KBW, and Chemical's financial advisor, Sandler O'Neill & Partners, L.P. ("Sandler") employed in their fairness analyses.  *See infra*, ¶¶78-86.

12.    Instead of attempting to obtain the highest price reasonably available for Talmer for its shareholders, defendants tailored the terms of the Proposed Acquisition to meet the specific needs of Company insiders and Chemical.  In essence, the Proposed Acquisition is the product of a hopelessly flawed process that was designed, by the issuance and dissemination of the false and misleading Proxy, to ensure the sale of Talmer to Chemical and Chemical only, on terms preferential to Chemical and to aggrandize the financial interests of the Company insiders at the expense of plaintiff and Talmer's public stockholders.  In

- 7 -

disseminating a materially false and misleading Proxy, the Individual Defendants and Talmer are violating §14(a) of the 1934 Act.

13.     Plaintiff seeks to enjoin the Proposed Acquisition.

## JURISDICTION AND VENUE

14.     Plaintiff's claims arise under §§14(a) and 20(a) of the 1934 Act. This Court has jurisdiction pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act, 15 U.S.C. §78aa. Defendants used the U.S. mails and the instrumentalities of interstate commerce.

15.     Venue is proper here pursuant to §27 of the 1934 Act, 15 U.S.C. §78aa, because Talmer is headquartered in this District and certain of the transactions, acts, practices and courses of conduct constituting the violations alleged herein occurred within this District.

## THE PARTIES

16.     Plaintiff City of Livonia Employees' Retirement System is, and at all times relevant hereto was, a shareholder of Talmer.

17.     Defendant Talmer is a Michigan corporation headquartered in Troy, Michigan.

18.     Defendant Chemical is a Michigan corporation headquartered in Midland, Michigan. Defendant Chemical is sued herein as an aider and abettor.

- 8 -

19.     Defendant Gary Torgow is and has been at all relevant times Talmer's Chairman and a member of the Board.  Torgow also serves Talmer Bank and Trust in an executive capacity.

20.     Defendant David T. Provost is and has been at all relevant times Chairman and CEO of Talmer Bank and Trust and a member of the Board.

21.     Defendant Gary S. Collins is and has been at all relevant times a member of the Board.

22.     Defendant Max A. Berlin is and has been at all relevant times a member of the Board.

23.     Defendant Jennifer M. Granholm is and has been at all relevant times a member of the Board.

24.     Defendant Paul E. Hodges III is and has been at all relevant times a member of the Board.

25.     Defendant Ronald A. Klein is and has been at all relevant times a member of the Board.

26.     Defendant Barbara J. Mahone is and has been at all relevant times Talmer's Lead Director and a member of the Board.

27.     Defendant Robert H. Naftaly is and has been at all relevant times a member of the Board.

1153040_1

28.     Defendant Albert W. Papa is and has been at all relevant times a member of the Board.

29.     Defendant Thomas L. Schellenberg is and has been at all relevant times a member of the Board.

30.     Defendant Arthur A. Weiss is and has been at all relevant times a member of the Board.

31.     The defendants named above in ¶¶19-30 are sometimes collectively referred to herein as the "Individual Defendants."

## THE PROPOSED ACQUISITION

**Background**

32.     Headquartered in Troy, Michigan, Talmer is the holding company for Talmer Bank and Trust.  Talmer Bank and Trust operates through branches and lending offices in Michigan, Ohio, Illinois, Indiana and Nevada, and offers a full suite of commercial and retail banking, mortgage banking, wealth management and trust services to small and medium-sized businesses and individuals.

33.     Chemical is the second largest banking company headquartered and operating branch offices in Michigan. Chemical currently operates through a single subsidiary bank, Chemical Bank, with 185 offices spread over 47 counties in

- 10 -

southwestern, central and northern Michigan.  As of December 31, 2015, the Corporation had total assets of $9.2 billion.

34.    In late December 2015, Talmer announced the bank had entered into an agreement with the FDIC that terminated Talmer's loss share agreements with the FDIC.  Additionally, Talmer and the FDIC agreed to terminate the warrant to purchase 390,000 shares of Talmer stock issued to the FDIC in association with a prior acquisition from the FDIC.  The loss share agreements were initially entered into in 2010 and 2011 in connection with Talmer's acquisitions of four failed banks from the FDIC.  Under the termination agreement, Talmer paid the FDIC $11.7mm as consideration for their early termination of the loss share agreements and $4.6mm as consideration to terminate all outstanding warrants.  The loss share agreements were initially formed in 2010 and 2011 in connection with Talmer's acquisitions of four failed banks from the FDIC.  As a result, Talmer reported a one-time $13.9 million charge in its fourth quarter of 2105 (ended December 31, 2015).

**Talmer's Ongoing and Growing Success**

35.    On December 31, 2105, J.P. Morgan commented favorably on Talmer's termination of the loss-share agreements:

Expenses expected to benefit from the termination of the loss share agreements. Besides the elimination of the negative accretion, which was a drag to earnings, TLMR should see benefits on the expense front with the termination of the loss share agreements. In the past, management had estimated roughly $1mm of annual administration expenses to manage the FDIC indemnification asset with another roughly $400k of other expense, mostly related to clawbacks.

36.     On January 26, 2016 Talmer reported fourth quarter 2015 net income of $13.1 million, compared to $20.0 million for the third quarter of 2015 and $12.5 million for the fourth quarter of 2014.  Earnings per diluted common share were $0.19 for the fourth quarter of 2015, compared to $0.27 for the third quarter of 2015 and $0.16 for the fourth quarter of 2014.  The decrease in net income in the fourth quarter of 2015 was primarily due to the after-tax charge resulting from the early termination of the Bank's FDIC loss share agreements and the FDIC's warrant of approximately $13.9 million, or $0.20 per diluted average share.

37.     During the fourth quarter of 2015, sales at Talmer totaled $87.88 million. This is an increase of 24.1% from the $70.84 million in sales at the Company during the fourth quarter of 2014. During the previous six quarters, sales at Talmer have increased compared with the same quarter in the previous year. Talmer reported sales of $321.33 million for the year ending December of 2015. This represents an increase of 15.5% versus 2014, when the Company's sales were $278.14 million.

38.     In addition, on January 25, 2016, the Board of Directors of Talmer increased the quarterly cash dividend on its Class A common stock to $0.05 from $0.01 per share.  The dividend was to be paid on February 18, 2016, to Talmer's Class A common shareholders of record as of February 4, 2016.

**The Proposed Acquisition Is Announced**

39.     Despite the Company's consistent revenue growth, the elimination of the negative accretion and drag on earnings from the now terminated loss-share agreements, and the increased dividend, the Board decided to sell Talmer.

40.     On January 26, 2016, Talmer announced that it had entered into the Merger Agreement with Chemical.  Pursuant to the Merger Agreement Chemical will acquire Talmer by purchasing all of the Company's outstanding shares at a purchase price of just 0.4725 of a share of Chemical common stock and $1.61 in cash for each share of Talmer common stock.  Following the consummation of the Proposed Acquisition, Talmer will be merged with and into Chemical, with Chemical as the surviving corporation.

41.     The press release announcing the Proposed Acquisition states in pertinent part:

### Chemical Financial Corporation to Partner With Talmer Bancorp, Inc.

- *Transformational strategic merger will create $16 billion-asset community bank*

- *Enhances preeminent Michigan-based retail banking franchise into Detroit MSA with strong southeast Michigan and northern Ohio franchise*

- *Adds approximately $6.6 billion in assets, $5.0 billion in deposits, and $4.8 billion in loans*

- *Will create largest Michigan-headquartered bank while adding attractive contiguous out of state markets*

- *Results in estimated 8% EPS accretion for Chemical in first full year*

- *Results in an estimated 3.25-years tangible book value earn back*

- *Combined company will donate $4.8 million to the Community Foundation of Southeast Michigan's Talmer / Chemical Donor Advised Fund, reflecting our strong commitment to our community*

. . . The boards of directors of Chemical Financial Corporation, the holding company for Chemical Bank, and Talmer Bancorp, Inc., the holding company for Talmer Bank and Trust, today announced the execution of a definitive agreement for Chemical Financial Corporation ("Chemical") to partner with Talmer Bancorp, Inc. ("Talmer") in a cash and common stock merger transaction valued at approximately $1.1 billion.

The merger will result in the creation of one of the largest community banks in the Midwest. Based on the companies balance sheets as of December 31, 2015, following completion of the transaction, the combined organization will have approximately $16 billion in assets, $12 billion in loans and $13 billion in deposits with 266 locations primarily in Michigan and northeast Ohio. The transaction will also allow the combined company to more effectively

- 14 -

and efficiently navigate the challenges and costs associated with becoming a larger banking institution.

Upon consummation of the merger, David B. Ramaker will continue to serve as CEO and President of Chemical Financial Corporation and Chairman, CEO and President of Chemical Bank. David T. Provost, Talmer's President and CEO and Chairman of Talmer Bank, will join the Chemical board of directors. Gary Torgow, Talmer's Chairman, will serve as Chairman of the Board of the combined entity.

Under the terms of the definitive agreement, Chemical will acquire all of the outstanding shares of Talmer common stock for common stock and cash in a transaction currently valued at approximately $1.1 billion, or $15.64 per share, based on the closing price of Chemical of $29.70 per share as of January 25, 2016. Talmer shareholders will receive 0.4725 shares of Chemical common stock and $1.61 per share in cash. Subject to receipt of regulatory approvals and satisfaction of other customary closing conditions, including approval of both Chemical and Talmer shareholders, the transaction is anticipated to close in the second half of 2016.

Chemical anticipates the transaction, with cost savings fully phased in, to be accretive to its earnings per share by approximately 8 percent in the first full year (excluding acquisition-related and integration costs associated with the transaction). Chemical expects net cost savings to reach an annual run rate of approximately $52 million. Pre-tax acquisition-related and integration costs associated with the transaction are expected to total approximately $62 million. Chemical estimates the tangible book value earn-back period to be approximately 3.25 years.

"This is clearly a transformational merger between two healthy Michigan banks with complementary geographies. We have been impressed by what Gary Torgow, Dave Provost and the Talmer team has accomplished in a relatively short period of time, growing Talmer into one of the region's leading financial institutions. We were even more impressed by the manner in which they did so: building a strong

- 15 -

core banking organization with talented commercial bankers and an attractive customer base. In Talmer, we are partnering with a like-minded, growth-oriented organization, which shares a conservative lending culture built by talented and experienced professionals who seek to develop and support long-term client relationships with businesses and consumers who reside in the communities they serve. In addition to the cultural fit, the two organizations will add talent, scale, and strong track records for acquisitive and organic growth that we believe will facilitate the combined organization's continued growth," said David B. Ramaker, Chairman, Chief Executive Officer and President of Chemical Financial Corporation.

"Through this partnership, we will make a marked entry into the southeast Michigan market, and expand for the first time beyond our State's borders. While Talmer's operations across Michigan clearly support our goal of being 'Michigan's Community Bank,' its operations in Northern Ohio and other contiguous states should position us well for future growth in those markets in the years ahead. We expect complementary strengths in specialty business lines such as wealth management and mortgage banking will lead to organic growth opportunities across the newly expanded franchise," added Ramaker.

"While both Chemical and Talmer have posted strong track records of acquisitive and organic growth, we view this as the start of the next stage of our companies' evolutions. By pairing two like-minded companies with consistent philosophies and cultures, and a strong focus on growth, we believe that shareholders of both organizations will benefit from the merger. The enhanced growth opportunities and efficiencies gained from the merger will strengthen our ability to achieve our goal of delivering strong and sustainable earnings growth over the longer term," said Gary Torgow, Chairman of the Board of Talmer Bancorp, Inc.

"Chemical's consistent, long-term track record of quality earnings growth driven by a customer-centric community banking strategy and focus make it an attractive partner, and we are confident that the clients, employees and shareholders of both companies will

- 16 -

benefit from the combined organization.  The resources and financial strength of the combined organization will allow us to better meet the credit needs of our communities and support the economic growth of our region," added David T. Provost, CEO and President of Talmer Bancorp, Inc.

After the closing, Chemical intends to consolidate Talmer Bank and Trust into Chemical Bank, and operate under the Chemical Bank name.  Talmer Bank and Trust will operate as a separate subsidiary of Chemical between the closing date and the conversion of data processing systems.  Five members of the Talmer board of directors will join Chemical's board upon completion of the transaction, bringing the total number of Chemical board members to 12.

To demonstrate its commitment to southeast Michigan, the combined companies announced a $4.8 million donation commitment to the Community Foundation of Southeast Michigan, Talmer / Chemical Donor Advised Fund.

Combining Chemical's 185 Michigan branches with Talmer's 51 Michigan locations will result in the state's third largest branch delivery system, while the entities' combined of approximately $10.8 billion in Michigan deposits, would make it the sixth largest bank, by deposits, in the state and the only one of those six headquartered in Michigan.  In addition to expanding Chemical's delivery system in its upper, central and southwest Michigan regions, the merger will introduce the Chemical brand to the southeast Michigan and northern Ohio markets, where it will have 31 and 27 branches, respectively.

Chemical was advised by the investment banking firm of Sandler O'Neill + Partners and the law firm of Warner Norcross & Judd LLP. Talmer was advised by the investment banking firm of Keefe, Bruyette & Woods and the law firm of Nelson Mullins Riley & Scarborough, LLP.

**Conflicts Poisoned the Process Leading
to the Proposed Acquisition**

42.    The Proposed Acquisition is the product of a hopelessly flawed process that is designed to ensure the sale of Talmer to Chemical on terms preferential to defendants and other Talmer insiders and to subvert the interests of plaintiff and the other public stockholders of the Company.   The Proposed Acquisition is being driven by the Company's current Board and management, who collectively hold 13.8% of Talmer's outstanding shares (over 9.1 million shares).   The Board and other Company insiders seek liquidity for their illiquid holdings in Talmer stock, and the Proposed Acquisition offers significant liquidity for their illiquid Talmer shares.   Thus Board members are conflicted and serving their own financial interests rather than those of Talmer's other shareholders.

43.    From the Proposed Acquisition, Talmer's officers and directors will receive millions of dollars in special payments – not being made to ordinary shareholders – for currently unvested stock options, performance units and restricted shares, all of *which shall, upon completion of the transaction, become fully vested and exercisable*.   The Company's senior management is also entitled to receive from the Proposed Acquisition millions more dollars in change-of-control payments.   For example, members of Talmer's Board and executive

- 18 -

management will be given the opportunity to tender for cash up to 25% of their outstanding Talmer options, which will result in a differential consideration of over $14.7 million.   And members of the Company's executive management will receive another $7.5 million in golden parachute compensation.

44.    Furthermore, while Talmer's shareholders are being cut out of the picture, in addition to "cashing in" their illiquid holdings, members of the Board and Company management appear to be staying on board after the transaction. The Merger Agreement provides that, at the effective time of the Merger, Chemical shall cause the size of the board of directors of the surviving corporation to be twelve directors, which shall include five of the current members of the Talmer board of directors (two of whom shall be defendants Torgow and Provost).

45.    Furthermore, and pursuant to the Merger Agreement, defendant Torgow entered into a services agreement with Chemical and Talmer Bank and Trust to serve as Chairman of the surviving corporation.  In addition, defendant Provost and Dennis Klaeser, Talmer's Chief Financial Officer, each entered into services agreements with Chemical and Talmer Bank and Trust,  pursuant to which they will continue to serve as employees of Talmer Bank and Trust and to assist in the integration of Talmer and Chemical.  Prior to the effective time of the Merger, Thomas Shafer, the President of Talmer Bank and Trust, will enter into an

- 19 -

employment agreement with the surviving bank to serve as an Executive Vice President of the surviving bank.

46.    The Proxy reveals that, pursuant to theses service agreements defendants Torgow and Provost will receive annual salaries of $1 million, and Klaesar will receive an annual salary of $500,000.  Moreover, Torgow, Provost and Klaeser will each receive a $600 monthly car allowance and a membership to the country club of their choice.

**These Unresolved and Unaddressed Conflicts
Led to an Unfair Process**

47.    As a result of these unresolved conflicts, the process leading to the Proposed Acquisition was unfair.  In fact, as defendant Provost has admitted, there was no process.  The Board was so sure it had found the right partner in Chemical that it did not shop Talmer for a better deal.

48.    For almost a year, the Board allowed KBW to represent its interests in discussions with Chemical even though KBW was serving as ***Chemical's financial advisor*** in Chemical's acquisition of another bank.  As early as May 2014, ***with Talmer's knowledge and approval***, KBW discussed with Chemical's Chairman, Chief Executive Officer and President, David B. Ramaker, a potential merger between Chemical and Talmer and offered to introduce Mr. Ramaker to Mr.

- 20 -

Provost of Talmer.  The Proxy does not disclose who at Talmer knew of or approved KBW's approach to Chemical, or the scope of that approval and whether it included conveying to Chemical Talmer's interest in a merger.  No one from Talmer was present during this discussion.

49.    Following an introduction by KBW, defendant Provost and Mr. Ramaker met on August 15, 2014 to discuss management philosophies and the concept of a potential business combination.  There was not an independent member of the Board present at this meeting.  In fact, according to the Proxy, at no time during the process was an independent member of the Board present during any meetings between Talmer or KBW and Chemical concerning the Proposed Acquisition.  For example, on September 24, 2014, defendants Torgow and Provost and Mr. Klaeser had discussions with Mr. Ramaker and Chemical's CFO, Lori A. Gwizdala to discuss how the respective cultures and governance of each organization might assimilate together following a potential business combination. During February 2015, Mr. Klaeser had discussions with Ms. Gwizdala, regarding Chemical's potential interest in a business combination with Talmer.

50.    In March 2015, ***with Talmer's knowledge and approval***, KBW provided information to Chemical regarding Talmer and a potential merger between Talmer and Chemical.  Again the Proxy does not disclose who at Talmer

- 21 -

actually knew about and approved KBW's provision of this information to Chemical, nor does it reveal what information about Talmer KBW provided to Chemical.

51.     On March 31, 2015, the Talmer Strategic Initiatives Committee held a meeting that was also attended by defendants Torgow and Provost, and Mr. Klaeser as well as KBW.  The Board of Directors formed the Strategic Initiatives Committee in November 2014 to facilitate preliminary consideration of corporate opportunities and involve the Board with management in preliminary discussions regarding such opportunities.  Following the March 31, 2015 meeting, KBW was engaged to serve as Talmer's financial advisor in connection with a potential transaction with an entity described in the Proxy as Institution E, but not in connection with any transaction with Chemical.  But in spite of KBW's ongoing relationship with Chemical, and again *with Talmer's knowledge and approval*, KBW also maintained communication with Chemical regarding a potential merger between Talmer and Chemical.  The Proxy does not disclose who at Talmer knew about or gave KBW permission for its communications with Chemical about a potential merger.

52.     The Proxy claims that as of May 31, 2015, when Chemical completed its previously announced acquisition of Lake Michigan Financial Corporation (for

- 22 -

which KBW had served as Chemical's financial advisor) KBW ceased to have any active investment banking services engagement with Chemical.  But almost two months later, on July 21, 2015, KBW attended a Chemical Board of Directors meeting *regarding a strategic options review*.  KBW was requested (presumably by Chemical) to discuss the state of the banking industry, overview of the markets, various operating themes, historical review of the mergers and acquisitions in the depository institution sector, Chemical's current business model and the issues surrounding crossing $10 billion in total assets, a summary of strategic options that might be available to Chemical (including the status quo, various acquisitions, mergers and control sale) and the advantages and disadvantages of each category.

53.    On June 18, 2015, defendant Provost and Mr. Ramaker met at a banking conference – outside the presence of any independent member of the Board to further discuss the possibility of a transformational merger between Talmer and Chemical.  This is the first time the Proxy describes the potential merger as "transformational," and strongly suggests that defendants Torgow and Provost had given up on maximizing shareholder value through a sale of Talmer that would have provided Talmer shareholders a premium (whether in cash or stock) and instead for their own interests agreed to structure the proposed deal as a "merger of equals" that would offer no premium to Talmer shareholders.

- 23 -

1153040_1

54.    Again June 24, 2015, Mr. Klaeser and Ms. Gwizdala met to discuss – without an independent Board member present – certain critical accounting matters and certain financial matters relating to a possible strategic transaction between Talmer and Chemical.

55.    As mentioned above, on July 21, 2015, KBW attended a Chemical Board of Directors meeting, and with ***Talmer's knowledge and approval***, one of the ***numerous examples of potentially available options for Chemical*** presented by KBW was a potential merger with Talmer.  The Proxy again fails to identify who at Talmer knew about or authorized KBW to present to Chemical, among ***numerous*** options, a merger with Talmer.

56.    On or around July 28, 2015, Institution E advised Talmer that it was not going to make a merger consideration proposal, in part because Institution E was not willing to offer a level of merger consideration that Institution E believed ***would be acceptable to Talmer***.

57.    The very next day, on July 29, 2015, defendant Provost and Mr. Ramaker from Chemical spoke at length on the telephone – outside the presence of any of the independent members of the Board – about a potential ***transformational*** merger. They agreed to revisit the matter over the following months once Chemical

- 24 -

completed integration activities related to its most recent acquisition for which KBW had served as its financial advisor.

58.     On October 26, 2015, the Talmer Strategic Initiatives Committee held a meeting that was also attended by Messrs. Torgow, Provost and Klaeser as well as KBW and considered that the proposed merger with Chemical **would be a transformational strategic combination** of similarly-sized institutions **rather than a sale** of Talmer to Chemical, again tanking the Talmer shareholders' opportunity to realize a premium from the proposed deal.

59.     On October 28, 2015, the Board authorized the Strategic Initiatives Committee to approve the retention of KBW as Talmer's financial advisor in connection with a potential merger with Chemical.

60.     On December 21, 2015 and December 22, 2015, the parties negotiated the terms of a draft preliminary, non-binding letter and term sheet ("letter of intent") for the transaction. On December 22, 2015, the Strategic Initiatives Committee met to review the letter of intent.

61.     The letter of intent contemplated merger consideration to Talmer shareholders composed of 90% Chemical stock and 10% cash.  The exchange ratio, viewed on a 100% stock merger consideration equivalent basis, was between 0.50 and 0.525 Chemical shares for each Talmer share.  Based on the closing price

of $34.65 for Chemical's shares on December 17, 2015, the range of the exchange ratio set forth in the letter of intent, viewed on a 100% stock merger consideration equivalent basis, indicated an implied value range of the merger consideration of between $17.32 and $18.19. Based on the closing price of $34.65 for Chemical's shares on December 17, 2015, and assuming a 100% stock merger consideration equivalent exchange ratio of 0.525, the implied value of the merger consideration of $18.19 for each Talmer share represented *a miniscule 4.3% premium* over Talmer's stock price of $17.44 on December 17, 2015.

62.     On December 22, 2015 the committee approved the non-binding letter of intent and recommended that the Board sell Talmer to Chemical for a meager 4.3% premium. The committee and Board's failure to insist upon a collar on the 90% stock portion of the merger consideration would result in the disappearance of even this small premium.

63.     By the time the Board considered the letter of intent on January 5, 2016, and due to the absence of a collar, the implied value of the merger consideration was reduced to $17.33 which represented a *1.8% discount* to the closing price of Talmer's shares as of January 4, 2016.

64.     On January 25, 2016, the Board held a meeting at which it considered the employment services agreements of defendants Torgow and Provost, and Mr.

Klaeser, as discussed above, and the special cash-out of 25% of the Board's and senior management's outstanding Talmer stock options.  But again due to the Board's failure to insist upon a collar on the 90% stock portion of the deal consideration that would have protected Talmer's shareholders, the implied value of the merger consideration was now just $16.11 per Talmer share, which represented a ***2.5% discount*** to Talmer's closing share price on January 22, 2016.

65.     In spite of that negative premium, at the conclusion of its January 25, 2016 meeting, the Board agreed to sell Talmer to Chemical for just 0.4725 of a share of Chemical common stock and $1.61 in cash for each share of Talmer common.  The Proxy also notes, for the first time, that five of the 12 total directors of the combined company would be current Talmer directors (including defendants Torgow and Provost).

66.     Moreover, as part of this unfair process, defendants have prepared and filed with the SEC the false and misleading Proxy in violation of §14(a) of the 1934 Act.

**The Conflicted and Unfair Process Resulted in an Unfair Price**

67.     As a result of the conflicted and unfair process, the price offered to Talmer shareholders is unfair.   The Proposed Acquisition price drastically undervalues the Company and its prospects.  First, based on the closing price of

- 27 -

Chemical stock the day before the Proposed Acquisition was announced ($29.70), the Proposed Acquisition consideration was valued at just $15.64 per Talmer share. But the $15.64 value of the Proposed Acquisition consideration: (i) represents a negative premium of 16.4% to, and is almost $3 below Talmer stock's recent, December 29, 2015, market high of $18.71 per share; (ii) is below the 52-week average of $16.26 per share; (iii) offers Talmer shareholders a negative premium of 2.3% from the Company's closing price of $16.00 per share on the day before the Proposed Acquisition was announced; and (iv) is dramatically lower than analysts' high and median price target of $21.00 per Talmer share, as well as the low price target of $19.00 per Talmer share.

68.     Second, Talmer shareholders have criticized this deal and its unfair price.   While Chemical and Talmer executives have described the Proposed Acquisition as a "merger of equals," some Wall Street analysts questioned that claim during the conference call Talmer and Chemical held following the deal's announcement.  One manager for Deutsche Bank – a Talmer Bank shareholder – argued the deal has the appearance of a sale that looks better for Chemical than for Talmer's shareholders.  "If this is a merger of equals, one party is clearly more equal than the other," said Rich Glass of Deutsche Bank, who asked Talmer executives why they agreed to the deal.  "You are selling for what looks like a

- 28 -

distressed price . . . after reporting good earnings, so it doesn't look like there should be a distressed sale here," he said.

69.    Glass went on: "As a shareholder, we are very disappointed . . . you should be ashamed of yourselves.  Your fiduciary responsibility is to shareholders, not the banks' future.  From our perspective, the valuation is not great at all.  It's lousy.  It's a great deal for Chemical shareholders and not a good deal for Talmer shareholders.  I don't know why all the shareholders for Talmer shouldn't vote this down."

70.    Glass also noted that early reaction on Wall Street, with Chemical stock rising and Talmer's falling, was an indication Talmer sold itself cheaply.

71.    The market has also questioned the timing and price of the Proposed Acquisition.   Sharewise Weekly concluded in its first report following the announcement of the Proposed Acquisition that Talmer was undervalued based on its dividend yield.  Sharewise opined that the target price at which Talmer would be fairly valued was $31.42.

72.    Stephens expressed surprise at the sale of Talmer, believing the Company "would pursue acquisitions until the bank grew closer to $10 billion in assets (currently at $6.5 billion) at which point they would more likely represent an acquisition target."

73.     J.P. Morgan wrote of its surprise "to see Talmer sell in a take-under transaction, particularly given larger premiums being paid for recent Midwest deals (such as FMER selling to HBAN)."

74.     Third, the Board failed to include a collar on the stock portion of the Proposed Acquisition consideration.  A collar would protect Talmer shareholders in the event that the market price of Chemical common stock declines between now and the closing of the Proposed Acquisition.

**Preclusive Deal Protection Devices**

75.     To protect against the threat of alternate bidders out-bidding Chemical after the announcement, defendants implemented preclusive deal protection devices to guarantee that Chemical will not lose its preferred position.  First, pursuant to the Merger Agreement, Talmer will hold a shareholder vote on the Proposed Acquisition.  The closing of the Merger is subject only to an affirmative vote by the holders of a simple majority of the Company's common stock.  Each of the Company's directors – who collectively hold almost 13% of Talmer's common stock – has entered into a support agreement with Chemical (collectively, the "Support Agreements"), in which each director agrees to vote in favor of the Proposed Acquisition and against any alternative offer to acquire Talmer.  Thus

- 30 -

fewer than 38% of Talmer's shareholders need to vote in favor of the Proposed Acquisition for it to close.

76.    In addition, defendants agreed to specific deal protection devices which effectively preclude *any* competing bids for Talmer.  Those deal protection devices will preclude a fair sales process for the Company and lock out competing bidders, and include:

(a)    a "no-solicitation" or "no-shop" provision that precludes Talmer from providing confidential Company information to, or even communicating with, potential competing bidders for the Company except under very limited circumstances;

(b)    an illusory "fiduciary out" for the no-shop provision that requires the Company to provide Chemical with advance notice before providing any competing bidder with any confidential Company information, even after the Board has determined that the competing bid is reasonably likely to lead to a superior proposal and that the Board would breach fiduciary duties by not providing the competing bidder with confidential Company information;

(c)    an "information rights" provision that requires the Company to provide Chemical with confidential, non-public information about competing proposals which Chemical can then use to formulate a matching bid;

- 31 -

(d)    a "matching rights" provision that requires Talmer to provide Chemical with the opportunity to match any competing proposal; and

(e)    a termination and expense fee provision that requires the Company to pay Chemical $34 million if the Proposed Acquisition is terminated in favor of a superior proposal.

77.    These unreasonable deal protection devices preclude other bidders from making a successful competing offer for the Company.   The support agreements and the deal protection devices prelude a fair sales process for Talmer's shareholders and make the Proposed Acquisition a virtual *fait accompli*.

**The False and Misleading Proxy**

78.    In order to encourage and obtain shareholder votes in favor of the Proposed Acquisition, in contravention of §14(a) of the 1934 Act, defendants filed and disseminated to shareholders the materially misleading Proxy.  The Proxy, which recommends that Talmer shareholders tender their shares to Chemical, omits and/or misrepresents material information about the potential and/or actual conflicts of interest present in the process leading to the Proposed Acquisition, the Company's inherent value, and the fairness analyses performed by the Company's financial advisor, Morgan Stanley.  Without this material information, Talmer shareholders are prevented from making a fully informed decision as to the

- 32 -

adequacy of the Proposed Acquisition consideration and whether to vote in favor of the Merger. Specifically, the Proxy omits/or misrepresents the material information set forth below in contravention of §14(a) of the 1934 Act.

79. The Proxy contains numerous material misstatements and otherwise fails to disclose material information about the flawed sales process, including:

(a)     who at Talmer had knowledge of, and who approved KBW's May 2014 discussions with Chemical about a potential merger between Talmer and Chemical, and the substance of the discussions between KBW and Chemical;

(b)     the specific parties Talmer or its advisors had preliminary exploratory discussions during 2014 and 2015, other than Institutions A, B, C, D, E, and Chemical;

(c)     the specific terms and associated dollar value of the merger consideration proposed by Institution E to Talmer on March 6, 2016;

(d)     who at Talmer had knowledge of, and who approved, KBW providing information in March 2015 to Chemical regarding Talmer and a potential merger between Talmer and Chemical, and the information KBW provided to Chemical in March 2015;

(e) the bases for the Board's March 31, 2015 perception that many Talmer shareholders were interested in maintaining an investment in a combined company;

(f) on or after March 31, 2015, who at Talmer had knowledge of, and who approved KBW maintaining communications with Chemical,  and what KBW communicated to Chemical;

(g) who requested that KBW attended Chemical's July 21, 2015 board meeting, and who requested that KBW discuss at that meeting the state of the banking industry, overview of the markets, various operating themes, historical review of the mergers and acquisitions in the depository institution sector, Chemical's current business model and the issues surrounding crossing $10 billion in total assets, a summary of strategic options that might be available to Chemical (including the status quo, various acquisitions, mergers and control sale) and the advantages and disadvantages of each category;

(h) who at Talmer had knowledge of, and who approved, KBW attending Chemical's July 21, 2015 board meeting;

(i) who at Talmer had knowledge of, and who approved, what KBW would say at Chemical's July 21, 2015 board meeting about a potential merger with Talmer;

- 34 -

(j)     who participated in the December 21 and 22, 2015 negotiations between the parties of the terms of a letter of intent for the transaction;

(k)     what terms were negotiated during the December 21 and 22, 2015 negotiations between the parties of the terms of a letter of intent for the transaction; and

(l)     what specific terms did Talmer's representatives propose during the December 21 and 22, 2015 negotiations between the parties of the terms of a letter of intent for the transaction.

80.     As defendants are seeking shareholder approval of the Merger, defendants have a duty to disclose fully and fairly all material details of the sales process, including those set forth in the previous paragraph. Shareholders are entitled to know, before deciding whether to vote for or against the Proposed Acquisition, the details that led to the Board's decision to sell the Company for an unfair price.

81.     The Proxy also made numerous material misstatements and otherwise failed to disclose material information about conflicts of interests that burdened the Board, Company management and their advisors, including:

(a)     the bases for the Board's decision to allow KBW to approach and engage, on Talmer's behalf, in discussions with Chemical about a potential

- 35 -

1153040_1

merger with Talmer from May 2014 through May 31, 2015, while KBW served as Chemical's financial advisor on the acquisition of another bank;

(b)    the conclusions the Board reached about KBW's service as Chemical's financial advisor and KBW's receipt of $4.8 million from Chemical in the past two years and whether those services and fees conflicted KBW's service as a financial advisor to the Board; and

(c)    the reasons for giving the Board and Company management different consideration for up to 25% of their options than Talmer's public shareholders will receive for their shares.

82.    In order for there to be an informed shareholder vote on the Merger, defendants are required to disclose even potential conflicts of interest.  Here the conflicts were more than potential, as Talmer's Board, financial advisor, and management were all conflicted.  Shareholders are entitled to know if their fiduciaries have interests in the transaction that are even potentially in conflict with the shareholders' interest in maximized value.  This information is material because shareholders must be told of all potential and actual conflicts of interests that bear on a director's ability to objectively assess merger transactions.

83.    Defendants also made material misstatements and otherwise failed to disclose material information in the Proxy about the Company's intrinsic value and

- 36 -

prospects going forward, including the financial projections provided by Talmer and Chemical management and relied upon by KBW and Sandler for purposes of their analyses, including:

(a)   the Talmer financial projections relied upon by KBW and Sandler for purposes of their analyses, for fiscal years 2015-2022, for the following items:

(i)   Book value (2018-2022);

(ii)   Tangible book value (2018-2022);

(iii)   Tangible common equity (2018-2022);

(iv)   Tangible assets (2018-2022);

(v)   Return on average assets;

(vi)   Return on average equity;

(vii)   Nonperforming assets / Assets;

(viii)   Tier 1 leverage ratio (2018-2022);

(ix)   Net interest margin;

(x)   Net income (2018-2022);

(xi)   Earnings per share (2018-2022); and

(xii)   Dividend yield (or dividends);

1153040_1

(b)    the Chemical financial projections relied upon by KBW and Sandler for purposes of their analyses, for fiscal years 2015-2020, for the following items:

(i)        Book value;

(ii)       Tangible book value;

(iii)      Tangible common equity;

(iv)      Tangible assets;

(v)       Return on average assets;

(vi)      Return on average equity;

(vii)     Nonperforming assets / Assets;

(viii)    Tier 1 leverage ratio;

(ix)      Net interest margin;

(x)       Net income;

(xi)      Earnings per share; and

(xii)     Dividend yield (or dividends).

84.    In order to determine whether to vote for or against a transaction like the one at the heart of this case, it is critical that shareholders receive the material information underlying or supporting the Company's inherent value.  Without this

- 38 -

information, shareholders cannot evaluate whether to vote in favor of or against the Merger.

85.   In the Proxy defendants also made several material misleading statements or otherwise failed to disclose material information about critical data and inputs underlying the financial analyses supporting the fairness opinions of Talmer's financial advisors KBW, and Chemical's financial advisor Sandler, including:

(a)   with respect to KBW's *Selected Companies Analyses* the following individual valuation multiples and metrics for each of the selected public companies analyzed by KBW:

(i)   LTM Core Return on Average Assets;

(ii)   LTM Core Return on Average Equity;

(iii)   LTM Core Return on Average Tangible Common Equity;

(iv)   LTM Net Interest Margin;

(v)   LTM Fee Income / Revenue Ratio;

(vi)   LTM Efficiency Ratio;

(vii)   Tangible Common Equity / Tangible Assets;

(viii)   Total Risk-Based Capital / Risk-Weighted Assets;

(ix)   Loans / Deposits;

- 39 -

(x)        Loan Loss Reserve / Gross Loans;

(xi)       Nonperforming Assets / Loans + OREO;

(xii)      LTM Net Charge-Offs / Average Loans;

(xiii)     Stock Price / Book Value per Share;

(xiv)      Stock Price / Tangible Book Value per Share;

(xv)       Stock Price / LTM EPS;

(xvi)      Stock Price / 2016 EPS;

(xvii)     Stock Price / 2017 EPS;

(xviii)    Dividend Yield; and

(xix)      LTM Dividend Payout;

(b)    with respect to KBW's *Select Transactions Analysis*:

(i)        the Transaction Price / Tangible Book Value, Transaction Price / LTM EPS, and Transaction Price / Next Year EPS Est. valuation multiples for each of the transactions selected by KBW in its analysis; and

(ii)       whether KBW performed any type of benchmarking analysis for Talmer to in relation the identified selected transactions;

(c)    with respect to KBW's *Pro Forma Financial Impact Analysis*, how accretive or dilutive the transaction is expected to be to Talmer's 2017 and

- 40 -

2018 estimated EPS and to Talmer's estimated tangible book value per share as of June 30, 2016;

     (d)    with respect to KBW's *Discounted Cash Flow Analysis*:

         (i)    the individual inputs and assumptions used by KBW to derive the discount rate range of 8.0%-12.0%; and

         (ii)    the implied perpetuity growth rate range based on the terminal P/E multiples of 11.0x-15.0x;

     (e)    with respect to Sandler's *Comparable Company Analysis*, the individually observed multiples and metrics (as described on page 63 and page 64 of the Proxy) for each of the Talmer and Chemical comparable companies;

     (f)    with respect to Sandler's *Analysis of Selected Merger Transactions*, the transaction dates and each of the following observed multiples and metrics for each of the merger transactions selected by Sandler in its analysis:

         (i)    Transaction price / LTM earnings per share;

         (ii)    Transaction price / Estimated earnings per share;

         (iii)    Transaction price / Book value per share;

         (iv)    Transaction price / Tangible book value per share;

         (v)    Core deposit premium; and

         (vi)    1-Day market premium;

- 41 -

(g)    with respect to Sandler's *Net Present Value Analyses*:

(i)    the individual inputs and assumptions used by Sandler to derive the discount rate range of 8.0%-12.0% for Chemical;

(ii)    the implied perpetuity growth rate range based on the terminal P/E multiples of 11.0x – 16.0x for Chemical;

(iii)    are the individual inputs and assumptions used by Sandler to derive the discount rate range of 9.0% - 13.0% for Talmer; and

(iv)    the implied perpetuity growth rate range based on the terminal P/E multiples of 11.0x – 16.0x for Talmer.

86.    There is no more material information to shareholders in a merger than the information underlying or supporting the purported "fair value" of their shares.  Shareholders are entitled to the information necessary to inform a decision as to the adequacy of the merger consideration, which includes the ***underlying data*** (including management's projections) the investment bankers relied upon, the ***key assumptions*** that the financial advisors used in performing valuation analyses, and the range of values that resulted from those analyses.  Here the analyses of KBW and Sandler incorporated certain critical assumptions that significantly affect the output (valuation) of the analyses.  Without this material information, shareholders have no basis on which to judge the adequacy of Chemical's offer.

87. Defendants were aware of the requirement under the federal securities laws to disclose the foregoing material information in the Proxy and acted with that knowledge in failing to ensure that this material information was disclosed in the Proxy. Absent disclosure of this material information, shareholders are unable to make an informed decision about whether to tender their shares or seek appraisal, and are thus threatened with irreparable harm.

88. Instead of attempting to obtain the highest price reasonably available for Talmer for its shareholders, defendants tailored the terms of the Proposed Acquisition to meet the specific needs of Company insiders and Chemical. In essence, the Proposed Acquisition is the product of a hopelessly flawed process that was designed, by the issuance and dissemination of the false and misleading Proxy, to ensure the sale of Talmer to Chemical and Chemical only, on terms preferential to Chemical and to aggrandize the financial interests of the Company insiders at the expense of plaintiff and Talmer's public stockholders. In disseminating a materially false and misleading Proxy, the Individual Defendants and Talmer are violating §14(a) of the 1934 Act.

89. Plaintiff seeks to enjoin the Proposed Acquisition.

## CLASS ACTION ALLEGATIONS

90.     Plaintiff brings this action individually and on behalf of a class of all the public shareholders of Talmer (the "Class").  Excluded from the Class are the defendants and any directors or officers of Talmer, as well as the members of their immediate families, and any entity in which any of them have a controlling interest and the legal representatives, heirs, successors or assigns or any such excluded party.

91.     The members of the Class are so numerous that joinder of all members is impracticable.

92.     Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and all members of the Class are being injured or legally damaged as a result of defendants' wrongful conduct.  Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

93.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by members of the Class may be relatively small, albeit significant, the expense and burden of individual litigation makes it virtually impossible for plaintiff and members of the Class individually to seek redress for the conduct alleged.  Plaintiff

- 44 -

knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.  Relief concerning plaintiff's rights under the laws involved herein and with respect to the Class as a whole would be appropriate.

94.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are: (a) whether defendants violated the federal securities laws as alleged in this Complaint, including violating and/or participating in a scheme to violate §14(a) of the 1934 Act; (b) whether defendants have made false or misleading statements in the Proxy in violation of §14(a) of the 1934 Act; and (c) whether the members of the Class have sustained damages, and if so, the proper measure of such damages.

## COUNT I

### Claim for Violation of §14(a) of the 1934 Act
### Against Talmer and the Individual Defendants

95.    Plaintiff repeats and realleges each allegation set forth herein.

96.    During the relevant period, the Individual Defendants and Talmer disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

- 45 -

97.    The Proxy was prepared, reviewed and/or disseminated by the Individual Defendants and Talmer.   It misrepresented and/or omitted material facts, including material information about the unfair sales process for the Company, the unfair consideration offered in the Proposed Acquisition, and the actual intrinsic value of the Company's assets.

98.    In so doing, the Individual Defendants and Talmer made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.   By virtue of their positions within the Company, the Individual Defendants and Talmer were aware of this information and of their duty to disclose this information in the Proxy.

99.    The Individual Defendants and Talmer were at least negligent in filing the Proxy with these materially false and misleading statements and omissions.

100.   The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Acquisition.   In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to shareholders.

- 46 -

101.   By reason of the foregoing, the Individual Defendants and Talmer have violated §14(a) of the 1934 Act and SEC Rule 14a-9(a) promulgated thereunder.

102.   Because of the false and misleading statements and/or omissions in the Proxy, plaintiff is threatened with irreparable harm, rendering money damages inadequate.   Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

### Against the Individual Defendants and Chemical for Violation of §20(a) of the 1934 Act

103.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

104.   The Individual Defendants acted as controlling persons of Talmer within the meaning of §20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of Talmer and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.

- 47 -

105.   Each of the Individual Defendants and Chemical was provided with or had unlimited access to copies of the Proxy and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

106.   In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Acquisition.  They were thus directly involved in the making of this document.

107.   Chemical also had direct supervisory control over the composition of the Proxy and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy.

108.   In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants and Chemical were each involved in negotiating, reviewing and approving the Proposed Acquisition.   The Proxy purports to

- 48 -

describe the various issues and information that they reviewed and considered, descriptions which had input from the Individual Defendants and Chemical.

109.   By virtue of the foregoing, the Individual Defendants and Chemical have violated §20(a) of the 1934 Act.

110.   As set forth above, the Individual Defendants and Chemical had the ability to exercise control over and did control a person or persons who have each violated §14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to §20(a) of the 1934 Act.  As a direct and proximate result of defendants' conduct, Talmer's shareholders will be irreparably harmed.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on plaintiff's own behalf and on behalf of the Class, prays for judgment as follows:

A.      Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.      Enjoining defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Acquisition, unless

- 49 -

and until defendants provide Talmer's shareholders with all material information necessary to make an informed choice about how to vote on the Proposed Acquisition;

C.      Declaring that defendants violated the federal securities laws as alleged herein by disseminating the Proxy in connection with the Proposed Acquisition, which contains materially false and misleading information about the Proposed Acquisition;

D.      Awarding plaintiff and the members of the Class compensatory damages in an amount that may be proven at trial, together with interest thereon;

E.      Awarding plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys', experts' and witness fees and other costs; and

F.      Awarding such other and further relief as this Court may deem just and proper, including any extraordinary equitable and/or injunctive relief as permitted by law or equity to attach, impound or otherwise restrict the defendants' assets to assure plaintiff has an effective remedy.

## JURY DEMAND

Plaintiff demands a trial by jury.

1153040_1

DATED:  June 16, 2016                     SHEA AIELLO, PLLC


                                          /s/ David J. Shea
                                          _____
                                          DAVID J. SHEA
                                          26100 American Drive 2nd Floor
                                          Southfield, MI  48034
                                          Telephone:  248/354-0224
                                          248/354-0440 (fax)
                                          david.shea@sadplaw.com
                                          ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                          DAVID T. WISSBROECKER
                                          EDWARD M. GERGOSIAN (P35322)
                                          655 West Broadway, Suite 1900
                                          San Diego, CA  92101
                                          Telephone:  619/231-1058
                                          619/231-7423 (fax)

                                          VANOVERBEKE MICHAUD
                                            & TIMMONY, P.C.
                                          THOMAS C. MICHAUD
                                          79 Alfred Street
                                          Detroit, MI  48201
                                          Telephone:  313/578-1200
                                          313/578-1201 (fax)

                                          Attorneys for Plaintiff

1153040_1

# EXHIBIT
# 1

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

CITY OF LIVONIA EMPLOYEES' RETIREMENT SYSTEM ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action: plaintiff holds 15,501 shares of Talmer stock as of the date of the certification and was a holder of Talmer at all relevant times.

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*In re General Cable Sec. Litig.*, No. 2:14-cv-00022 (E.D. Ky.)

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _15th_ day of June, 2016.

CITY OF LIVONIA EMPLOYEES'
RETIREMENT SYSTEM

By: _____

Its: _____

TALMER