# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| CITY OF LIVONIA EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | )<br>)<br>)<br>) | Civ. No. 1:16-cv-12229-TLL-PTM<br><br>CLASS ACTION |
| Plaintiff, | )<br>) | AMENDED COMPLAINT FOR VIOLATIONS OF §§14(A) AND 20(A) OF THE SECURITIES EXCHANGE ACT OF 1934 |
| vs. | )<br>) | |
| TALMER BANCORP, INC., et al., | )<br>) | |
| Defendants. | )<br>) | DEMAND FOR JURY TRIAL |
| | ) | |

Plaintiff City of Livonia Employees' Retirement System, individually and on behalf of all others similarly situated, by the undersigned counsel, alleges the following based upon information and belief, except for plaintiff's own acts, which are alleged on knowledge, and upon a continuing investigation conducted by and through plaintiff's counsel into the facts and circumstances alleged herein, which included, without limitation, review and analyses of: (i) the public filings of Talmer Bancorp, Inc. ("Talmer" or the "Company") and Chemical Financial Corporation ("Chemical") with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases, public statements, analyst reports, news articles and other publications disseminated by or concerning Talmer, Chemical, their respective related entities and the Merger (as defined below); (iii) the corporate websites of Talmer and Chemical; and (iv) other public information concerning Talmer, Chemical, and the Merger, including transcripts of related actions in Michigan State Court.

## INTRODUCTION

1.      This is a class action brought on behalf of all Talmer stockholders of record on June 8, 2016 who were entitled to vote on the proposal to adopt the Agreement and Plan of Merger (the "Merger Agreement") between Talmer and Chemical dated January 26, 2016 and providing mixed consideration of 0.4725 of a share of Chemical common stock and $1.61 in cash for each share of Talmer common

1456406_1

stock (the "Merger").   Plaintiff brings claims against Talmer, the members of Talmer's Board of Directors (the "Talmer Board") and Chemical arising from the dissemination of a materially misleading proxy statement in violations of §§14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and SEC Rule 14a-9 promulgated thereunder, 17 C.F.R. §240.14a-9.  Plaintiff seeks damages on behalf of itself and the other former Talmer stockholders.

2.      Rather than being a carefully vetted transaction that was pursued, negotiated and approved solely to serve the interests of Talmer's public stockholders, the Merger was the product of egregious  conflicts of interest and served only to benefit defendants.  When Talmer's strong financial prospects drew the attention of potential merger partners,  the Company's financial advisors at Keefe, Bruyette & Woods, Inc. ("KBW") used that opportunity to push for a transaction between Talmer and Chemical, with whom KBW had a long-standing and lucrative financial relationship.   In fact, while advising Talmer on a potential sale and contractually bound to represent the interests of the Company, KBW was simultaneously advising Chemical on an acquisition of Talmer.  By successfully pushing this combination, KBW was able to collect a $12 million advisory fee from Talmer, which was almost entirely contingent upon a sale of the Company, and strengthen its relationship with

Chemical – a business that would nearly double in size in the process and provide KBW further opportunities for multi-million dollar advisory fees going forward.

3.      Compounding the conflict of interest of KBW, the Talmer Board immediately began negotiating for themselves once discussions with Chemical heated up.  Before any material terms of a potential transaction were agreed upon, including the price that Chemical would pay in the Merger, the Talmer Board was pushing for new employment contracts and future directorships for Talmer insiders with Chemical for after the closing of a sale, as well as disparate consideration that allowed certain Company insiders to receive immediate cash payments for their Talmer stock options.

4.      The consideration accepted by the Board on behalf of Talmer stockholders in the Merger drastically undervalued the Company and its prospects. Based on the closing price of Chemical stock the day before the Merger was publicly announced, the consideration was valued at just $15.64 per Talmer share.  Such consideration: (i) represented a negative premium of 16.4% to and is almost $3 below Talmer stock's recent market high of $18.71 per share on December 29, 2015; (ii) was below the 52-week average of $16.26 per share; (iii) left Talmer stockholders with a negative premium of 2.3% from the Company's closing price of $16.00 per share on the day before the Merger was announced; and (iv) was significantly lower than price targets from analysts.  However, by directing KBW to use watered down financial

- 3 -

forecasts in the valuation analyses, the Talmer Board was able to create a false appearance that the consideration being offered nonetheless represented a fair value for Talmer stockholders.

5.    As part of its advisory work for the Talmer Board, KBW performed certain financial analyses, including a discounted cash flow ("DCF") analysis, that were intended to assess the value of the Company.  A DCF analysis is widely used in investment banking, including in merger transactions, to assess the value of a business by estimating all future cash flows and discounting them to their present value.  DCF analysis is a critical aspect in evaluating the fairness of consideration offered in a merger transaction, as it provides an intrinsic valuation based upon the target company's expected financial performance.  However, since the basis for a DCF is inherently contingent upon the forecasts used for the target company's future earnings, a manipulation of those forecasts can result in an unreliable valuation.

6.    Rather than representing  best estimates of future earnings based on the Talmer Board's and management's expectations regarding the manner in which the Company would be operated going forward, the financial projections that the Talmer Board directed KBW to use for its DCF analysis contained a critical flaw: ***they assumed that Talmer would suddenly abandon its well-established acquisition strategy***.  As discussed in detail below, Talmer had used a strategy of acquiring

- 4 -

smaller, distressed banking institutions to continuously grow its operations for the last decade.   In fact, the Talmer management team prepared financial projections incorporating future acquisitions that were provided to and approved by the Federal Deposit Insurance Corporation (the "FDIC") in the ordinary course of business. Talmer had also touted its acquisition strategy to the Company's stockholders in regular filings with the SEC from the time it went public through the closing of the Merger.

7.     Although the Talmer Board was well aware of the flaws associated with the financial projections that KBW used for its DCF analysis, Talmer's stockholders were not.  In the Joint Proxy Statement (the "Proxy Statement") issued by Talmer and Chemical and filed on Schedule 14A with the SEC in connection with the Merger, defendants failed to disclose that the financial projections KBW utilized and set forth therein did not incorporate any future acquisitions by Talmer.  Defendants also withheld all financial projections for Talmer that did incorporate future acquisitions, including the financial projections that the Company had provided to the FDIC.  By providing only those financial projections that were used to rubberstamp the Merger despite an unfair price, defendants withheld from stockholders all reasonable estimates of the Company's near-term financial performance that reflected the manner in with the Company was going to be operated.

- 5 -

8.     The Proxy Statement also withheld material information regarding KBW's self-interest actions during the course of negotiations between Talmer and Chemical.  The Proxy Statement indicates that KBW met with Chemical in July 2015 and again in October 2015 to discuss a potential acquisition of Talmer and provided advice to the Chemical Board and its management team.  The Proxy Statement also represents that Talmer was both aware of and authorized those meetings.  In reality, the Talmer Board was unaware of these meetings and that the Company's own financial advisor had and continued to advise the counterparty in its negotiations long after KBW signed an engagement letter to exclusively provide advice to Talmer.

9.     As a result of the materially false and misleading statements contained in the Proxy Statement, defendants were able to obtain stockholder approval of the Merger and deprived Talmer stockholders of the fair value of their shares in the Company.  On July 14, 2016, a majority of Talmer stockholders voted their shares in favor of the Merger, which subsequently closed on August 31, 2016.  The preparation and dissemination of the materially false and misleading Proxy Statement induced stockholder action and resulted in substantial harm to plaintiff and Talmer's other stockholders.  This action seeks damages on behalf of Talmer's stockholders that were caused by defendants' materially false and misleading Proxy Statement disseminated in contravention of §§14(a) and 20(a) of the 1934 Act.

- 6 -

## JURISDICTION AND VENUE

10.    Pursuant to 28 U.S.C. §§1331 and 27 of the 1934 Act, this Court has jurisdiction over the claims arising under and pursuant to §14(a) and §20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder, 17 C.F.R. §240.14a-9.

11.    This Court has personal jurisdiction over each of the defendants because each is either a corporation that conducts business in and maintains operations in the forum state, has purposefully directed its activities toward the forum state, or is an individual who has sufficient minimum contacts with the forum state so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.  Moreover, defendants include former Talmer officers and/or directors who reside in Michigan.

12.    Venue is proper here pursuant to §27 of the 1934 Act, 15 U.S.C. §78aa, because Talmer was headquartered in this District and certain of the transactions, acts, practices and courses of conduct constituting the violations alleged herein occurred within this District.

## THE PARTIES

13.    Plaintiff City of Livonia Employees' Retirement System was a Talmer stockholder at all times relevant hereto, owned 15,501 shares of Talmer common

stock as of the record date, and was entitled to vote at the Special Meeting concerning the Merger.

14.    Prior to the Merger, Talmer was a publicly traded company with its stock being traded on the NADAQ under the ticker symbol "TLMR."  Talmer was incorporated in the State of Michigan and headquartered in Troy, Michigan.  Talmer conducted its operations through its operating subsidiaries, including Talmer Bank and Trust ("TBT").  TBT was a regional banking institution that operated 81 branches – primarily throughout Michigan, Ohio and Indiana – and offered a full suite of commercial and retail banking, mortgage banking, wealth management and trust services to individuals small and medium-sized businesses.

15.    Defendant Chemical is a publicly traded company with its stock being traded on the NASDAQ under the ticker symbol "CHFC."  Chemical is incorporated in Michigan and headquartered in Midland, Michigan.  Chemical is a bank holding company whose subsidiaries operate 212 banking offices throughout Michigan, Northeast Ohio, and Northern Indiana.

16.    Defendant Gary Torgow ("Torgow") was the Chairman of the Talmer Board from December 2009 through the closing of the Merger in August 2016. Torgow also served in an executive capacity for TBT from January 2010 through the closing of the Merger.  In its filings with the SEC, Talmer acknowledged that Torgow

was not an independent director because of his employment as an executive officer within the Company. Torgow joined the Chemical Board of Directors (the "Chemical Board") following the closing of the Merger and still holds that position today.

17. Defendant David T. Provost ("Provost") served as Chief Executive Officer and President of Talmer and a member of the Talmer Board from December 2009 through the closing of the Merger in August 2016. Provost also served as President of TBT from December 2009 to September 2014. In its filings with the SEC, Talmer acknowledged that Provost was not an independent director because of his employment as an executive officer within the Company. Provost signed both the Proxy Statement and the Merger Agreement on behalf of Talmer. Provost joined the Chemical Board following the closing of the Merger and still holds that position today. On June 21, 2017, Chemical announced that Provost would take over as Chemical's President and Chief Executive Officer.

18. Defendant Gary S. Collins ("Collins") served as a member of the Talmer Board from April 2010 and Vice Chairman from March 2011 through the closing of the Merger in August 2016. At the time of the Merger, Collins also served as Chief Executive Officer and President of Talmer West Bank, an operating subsidiary of the Company. In its filings with the SEC, Talmer acknowledged that Collins was not an

- 9 -

independent director because of his employment as an executive officer within the Company.

19.     Defendant Max A. Berlin ("Berlin") served as a member of the Talmer Board from April 2010 through the closing of the merger in August 2016. At the time of the Merger, Berlin served as a member of both the Audit Committee and the Compensation Committee of the Talmer Board.

20.     Defendant Jennifer M. Granholm ("Granholm") served as a member of the Talmer Board from August 2013 through the closing of the Merger in August 2016.  At the time of the Merger, Berlin served as a member of both the Audit Committee and the Nominating and Corporate Governance Committee of the Talmer Board.

21.     Defendant Paul E. Hodges III served as a member of the Talmer Board from April 2010 through the closing of the merger in August 2016.

22.     Defendant Ronald A. Klein ("Klein") served as a member of the Talmer Board from April 2010 through the closing of the merger in August 2016.  At the time of the Merger, Klein served as a member of both the Compensation Committee and the Strategic Initiatives Committee of the Talmer Board.  Klein joined the Chemical Board following the closing of the Merger and still holds that position today.

23.     Defendant Barbara J. Mahone ("Mahone") was member of the Talmer Board from March 2013 through the closing of the merger in August 2016.  At the time of the Merger, Mahone served as a member of the Compensation Committee, the Strategic Initiatives Committee and the Audit Committee of the Talmer Board. Mahone joined the Chemical Board following the closing of the Merger and still holds that position today.

24.     Defendant Robert H. Naftaly ("Naftaly") served as a member of the Talmer Board from April 2010 through the closing of the merger in August 2016.  At the time of the Merger, Naftaly served as a Chairman of the Audit Committee of the Talmer Board.

25.     Defendant Albert W. Papa ("Papa") served as a member of the Talmer Board from April 2010 through the closing of the Merger in August 2016.  At the time of the Merger, Papa served as the Chairman of the Nominating and Corporate Governance Committee and a member of the Strategic Initiatives Committee of the Talmer Board.

26.     Defendant Thomas L. Schellenberg ("Schellenberg") served as a member of the Talmer Board from April 2010 through the closing of the Merger in August 2016.  At the time of the Merger, Schellenberg served as a member of both the Audit Committee and the Compensation Committee of the Talmer Board.

- 11 -

27.    Defendant Arthur A. Weiss ("Weiss") served as a member of the Talmer Board from May 2007 through the closing of the Merger in August 2016.  At the time of the Merger, Weiss served as a member the Compensation Committee of the Talmer Board.  Weiss joined the Chemical Board following the closing of the Merger and still holds that position today.

28.    The defendants listed in ¶¶16-27 are sometimes referred to herein as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

29.    Plaintiff's claims are brought on its own behalf and as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of all owners of Talmer common stock and their successors in interest, except defendants and their affiliates (the "Class").

30.    Plaintiff's claims are properly maintainable as a class action under Federal Rule of Civil Procedure 23.

31.    The Class is so numerous that joinder of all members is impracticable. According to the Proxy Statement, Talmer had more than 67 million outstanding shares of common stock that were entitled to vote at the Special Meeting on the Merger.

1456406_1

32.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.   The common questions include, but are not limited to, whether defendants violated §§14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 by preparing, reviewing and disseminating a misleading Proxy Statement, and whether plaintiff and the other members of the Class have been damaged as a result of the conduct detailed herein.

33.     Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class.

34.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

35.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

36.     Plaintiff anticipates that there will be no difficulty in the management of this litigation.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

37.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## BACKGROUND OF THE MERGER

**Talmer's Successful and Well-Settled Acquisition Strategy**

38.    Prior to the Merger, Talmer's banking subsidiaries operated 81 branches – primarily throughout Michigan, Ohio and Indiana – and offered a full suite of commercial and retail banking, mortgage banking, wealth management and trust services to individuals and small and medium-sized businesses.

39.    As the Company explained to its stockholders in the Form S-1 Registration Statement (the "Prospectus") issued in connection with its initial public offer (the "IPO") and filed with the SEC on January 1, 2010, Talmer's business plan was to become "a leading regional banking franchise in the Midwestern United States," with its future growth being fueled not just by the organic expansion of its current operations, but also through "the acquisition of additional banking franchises, including underperforming and undercapitalized banks and other complementary assets." The Prospectus identified Talmer's acquisition strategy as one of just four "key components of [the Company's] strategic plan," with the others focused on operational aspects of the business.

1456406_1

40.    In describing to stockholders this core aspect of Talmer's strategy, the

Prospectus explained that:

> We seek to carefully select banking acquisition opportunities that we
> believe have strong core deposit bases and significant local market share,
> while structuring the transactions to mitigate risk and maximize
> operating efficiencies.  Further, we seek acquisitions in markets that we
> believe have the potential to offer substantial benefits through reliable
> income streams (after acquired loans are adjusted to their estimated fair
> value at acquisition), potential add-on transactions and long-term organic
> growth opportunities.   Our future acquisitions may also include
> distressed bank acquisitions where our operations, underwriting and
> servicing capabilities and/or management experience give us an
> advantage in evaluating and resolving the assets.  We are currently
> targeting the Midwest markets primarily in our concentrated markets of
> Michigan and Ohio, as well as other markets in Wisconsin, Illinois and
> Indiana.  We believe that we utilize a comprehensive, conservative due
> diligence process that is strongly focused on loan credit quality, stable
> deposits and earnings potential.

41.    As a means of implementing the Company's acquisition strategy, the

Talmer Board formed a subcommittee of directors – named the Strategic Initiatives

Committee – that was charged with working with the Company's management team

and advisors to evaluate potential transactional opportunities.

42.    Leading up to the Merger, Talmer was successfully executing on this

acquisition plan.  For example, on November 19, 2010, Talmer acquired First Banking

Center ("FBC"), which was headquartered in Burlington, Wisconsin and had over

$684 million in assets.  The transaction was facilitated by the FDIC, which serves as

an independent regulatory body for banking institutions and insures customer deposits, and required Talmer to pay a transaction premium of just 0.5% to FBC's deposits.

43.    On February 11, 2011, Talmer acquired Peoples State Bank, which operated branches through Southeast Michigan and had $3.89.5 million in assets and $389.9 million in deposits.  Talmer submitted a negative bid of $45.5 million to the FDIC to acquire Peoples State Bank.  The amount of the negative bid, combined with necessary adjustments to balance the assets acquired and liabilities assumed, was paid to Talmer by the FDIC in exchange for assuming Peoples State Bank's liabilities.  In the Prospectus, Talmer explained the tremendous value that the Company received through the acquisition, stating: "The acquisition of Peoples State Bank resulted in a bargain purchase gain of $12.7 million recorded in the year ended December 31, 2011."

44.    On December 15, 2011, Talmer acquired Lake Shore Wisconsin Corporation ("Lake Shore"), which held assets consisting of approximately $26.0 million in cash and cash equivalents.  In a press release announcing the transaction, Provost stated that Talmer's purchase of Lake Shore was "an encouraging endorsement of our growth and acquisition strategy" and substantially strengthened

the Company as it continued to "explore expansion opportunities throughout the Midwest."

45.   On January 1, 2013, Talmer purchased substantially all of the assets of First Place Financial Corp. ("First Place") for cash consideration of $45 million and seized on the opportunity to acquire an undervalue asset through a bankruptcy auction. At the time of the transaction, First Place operated 41 branches through the Midwest and held approximately $2.3 billion in assets.  With the First Place acquisition, Talmer's balance sheet grew substantially, creating $4.5 billion in total assets and $3.9 billion in total deposits for the Company.  In the Prospectus, Talmer advised: "The acquisition of First Place Bank resulted in a bargain purchase gain of $71.7 million recorded in the quarter ended March 31, 2013."

46.   On January 1, 2014, Talmer acquired the Bank of Las Vegas, Indiana Community Bank, Ann Arbor-based Michigan Commerce Bank and Sunrise Bank of Albuquerque, New Mexico, which were previously owned and operated by Financial Commerce Corporation and Capitol Bancorp Ltd., through a transaction facilitated by Section 363 of the U.S. Bankruptcy Code.  Through this transaction, Talmer added approximately $857.8 million in deposits and $904.8 million in other assets, including $572.2 million in loans and $30.9 million of real estate.

- 17 -

47.     On February 6, 2015, Talmer acquired First of Huron Corp. ("First Huron") for aggregate cash consideration of $13.4 million.  First Huron was the holding company of Signature Bank, which operated eight branches through lower Michigan and held over $228 million in assets.  In a press release first announcing this transaction, Provost explained that the acquisition of First Huron was "consistent with our strategic focus" and the added operations were "a great complement to our existing footprint."

48.     By early 2016, Talmer's acquisition strategy had successfully increased the Company's asset base to approximately $6.6 billion, with the Company forecasting additional growth.  In business plans and financial models submitted to the FDIC, Talmer forecasted sustained growth for the Company by continuing its well-established acquisition strategy.   The FDIC made no objection to Talmer's acquisition-driven growth strategy and gave its approval.

49.     Provost's public statements in the months leading up to the Merger confirmed not only Talmer's strong financial outlook, but that Talmer planned to continue with the Company's acquisition strategy.  In fact, in every press release that Talmer issued in 2015 regarding the Company's quarterly operating results, Provost reinforced this plan with the Company's stockholders.

1456406_1

50.     In press release from January 30, 2015 discussing Talmer's operating results for the fourth quarter of 2014, Provost states: "Looking forward, our lending pipelines are strong, and we plan to make further incremental improvements in our operating efficiency in early 2015 given the anticipated first quarter completion of the First of Huron Corporation acquisition and the operational integration of Talmer West Bank."  Provost concluded his comments by adding: "Our team remains optimistic about the substantial organic growth opportunities in our existing markets and continues to be well-prepared to pursue additional acquisitions."

51.     In a press release from April 30, 2015 discussing Talmer's operating results for the first quarter of 2014, Provost states: "We continue to execute on our strategic plans to build a leading Midwest community bank.  In February, we completed the acquisition of First of Huron Corp., and its wholly-owned bank subsidiary, Signature Bank, and additionally completed the operational integration of Talmer West Bank."  Provost concluded his comments by adding: "Our team remains optimistic about the substantial growth opportunities in our existing markets and continues to be well-prepared to pursue additional acquisitions."

52.     In a press release from July 30, 2015 discussing Talmer's operating results for the second quarter of 2015, Provost states: "We are pleased with underlying trends this quarter including strong core deposit growth, improved operating expense

trends, quality loan growth and solid revenue trends from our fee businesses." Provost concluded his comments by adding: "Our team remains optimistic about the substantial growth opportunities in our existing markets and continues to be well-prepared to pursue additional acquisitions."

53.     In a press release from October 28, 2015 discussing Talmer's operating results for the second quarter of 2015, which would be the final quarterly earnings release before the Talmer Board's approval of the Merger, Provost states: "We are pleased with underlying trends this quarter including strong core deposit growth, declines in operating expenses and solid revenue trends.   Core deposit growth benefited from the continued focus of our retail sales force to drive growth in key markets in order to fund our lending pipelines."  Provost concluded his comments by adding: "Going forward, we continue to be keenly focused on driving healthy organic franchise growth and being well-prepared for potential acquisition opportunities."

54.     In the Company's Form 10-K filed on February 29, 2016 (the "Form 10-K"), approximately one month after the execution of the Merger Agreement, Provost acknowledges that Talmer had "grown substantially since our operations began in August 2007, with much of the growth occurring through acquisitions."  Looking forward, Provost states that Talmer's "strategic growth plan contemplates additional

- 20 -

acquisitions," and the Company would "continue to evaluate opportunities to acquire additional financial institutions, including purchases of failed banks from the FDIC."

55.    As became public through the state court litigation concerning the Merger, the Company's Chief Financial Officer ("CFO"), Dennis Klaeser ("Klaeser") confirmed in sworn deposition testimony that Talmer planned to continue its acquisition strategy as an independent business if the Talmer Board had not agreed to the Merger with Chemical.

**The Merger Is Plagued By Conflicts of Interests**

56.    Shortly after the IPO in 2014, KBW prompted Talmer and Chemical to begin discussing a potential business combination between the two companies.  In May 2014, KBW requested Talmer's approval to contact Chemical's Chairman, Chief Executive Officer and President, David B. Ramaker ("Ramaker"), to raise a potential transaction with Talmer and offer a meeting between Ramaker and Provost.  The Talmer Board approved KBW's request.

57.    Advising Talmer on a transaction with Chemical posed a patent conflict of interest for KBW, which had extensive financial ties to Chemical.  In fact, KBW's lead banker in its advisory role for Talmer, Jim Harasimowicz ("Harasimowicz"), was also the primary relationship banker for KBW with Chemical.  This role tasked

- 21 -

Harasimowicz with regularly soliciting new business from Chemical and being the primary point of contact for KBW.

58.    KBW's ties to Chemical went well-beyond mere relationships.  Since 2013 alone, KBW had earned $7.6 million in fees in serving as "Chemical's lead advisor on both capital raising and M&A activities" and representing Chemical in the following capacities:

- KBW was underwriter and lead book-runner in two equity offerings for Chemical involving $50 million in 2013 and $70 million in 2014;

- KBW advised Chemical in its $120 million acquisition of Northwestern Bank, which was executed in spring 2014 and closed in October 2014;

- KBW advised Chemical in its $26 million acquisition of Monarch Community Bancorp, which was executed in October 2014 and closed in April 2015; and

- KBW advised Chemical in its $184 million acquisition of Lake Michigan Financial, which was executed in January 2015 and closed in June 2015.

59.    By pushing a sale of Talmer to Chemical, KBW could not only cash in on advisory fees from Talmer (which ultimately amounted to approximately $12 million), but KBW could also strengthen its existing relationship with Chemical – a company that would nearly double in size in the process and provide further opportunities for multi-million dollar advisory fees going forward.

60.    Following an introduction by KBW, Provost and Ramaker met on August 15, 2014 to discuss their companies and a potential business combination.  On

- 22 -

September 24, 2014, Provost, Torgow, and Klaeser met with Ramaker and Chemical's Chief Financial Officer, Lori A. Gwizdala, to discuss corporate governance matters and the integration of their companies in a possible transaction.

61.     In late 2014, these discussions stalled when Chemical was nearing a deal to acquire Lake Michigan Financial, which served as the holding company for The Bank of Northern Michigan and other smaller regional banking institutions.  KBW served as financial advisor to Chemical in its acquisition of Lake Michigan Financial. In the interim, KBW continued to advise the Talmer Board regarding its strategic planning and pushed for a potential sale of the Company.  KBW told the Talmer Board that there could be "positive market reaction" to such a transaction and the "banking industry M&A environment" was strengthening.

62.     When Chemical closed its acquisition of Lake Michigan Financial in June 2015, Talmer and Chemical re-engaged in discussions over a potential transaction, and the Talmer Board authorized the formal engagement of KBW as a financial advisor in a sale of the Company during  a meeting on June 17, 2015. Talmer and KBW executed the engagement letter in early July 2015.  Soon thereafter, Chemical began to work both sides of a deal between Talmer and Chemical.

63.     Despite being contractually bound to represent the interests of Talmer in connection with a potential sale of the Company, KBW attended a meeting of the

- 23 -

Chemical Board on July 21, 2015 and ***advised Chemical*** on an acquisition of Talmer. Specifically, KBW's presentation provided information regarding transaction structure and the financial impact to Chemical in an acquisition of Talmer.  KBW prepared an updated presentation ***for Chemical's management team*** in advance of an upcoming meeting of the Chemical Board on October 20, 2016.  Once again, these materials advised Chemical regarding the structure for an acquisition of Talmer and the financial benefits to Chemical.

64.    Just days later, on October, 26, 2015, KBW attended a meeting of Talmer's Strategic Initiatives Committee and made a presentation concerning a potential sale to Chemical.  Although KBW continued to push a potential transaction with Chemical, KBW did not disclose to the Strategic Initiatives Committee that it had been advising Chemical in the proceeding weeks on an acquisition of Talmer or the full scope of its ties to Chemical.  Without this information, Talmer proceeded with transaction discussions and negotiations with Chemical, not knowing that their own financial advisors had provided financial advice to the other side.

65.    When it came time to execute an updated engagement letter with KBW to reflect a transaction with Chemical, KBW met with Talmer's Strategic Initiatives Committee on November 3, 2015 and disclosed for the first time some of its financial ties to, prior engagements with, and fees earned from Chemical.  However, KBW

- 24 -

never made this same representation to the full Talmer Board. Moreover, KBW never disclosed to either the Strategic Initiatives Committee or the Talmer Board that it had provided financial advice to Chemical on an acquisition of Talmer. As became public through the state court litigation concerning the Merger, Klein – who was not just a Talmer director but also a member of the Strategic Initiatives Committee – could not confirm during two separate depositions that he was ever expressly notified that KBW had been advising Chemical on a transaction with the Company before the Talmer Board approved the Merger.

66.     Compounding the conflict of interests and self-interested conduct of KBW, Talmer's directors immediately began negotiating for themselves when discussions with Chemical heated up. Before any material terms of a potential transaction were agreed upon, including the final price that Chemical would pay in the Merger, the Board was pushing for the continuing employment and future directorships for Talmer officers and directors with Chemical for after the closing of a sale.

67.     These negotiations handsomely rewarded Talmer insiders. On January 25, 2016, the Talmer Board approved the Merger Agreement, which provided that Torgow would be  appointed as Chairman of the Chemical Board and Provost would be appointed Vice Chairman. For their new positions, Torgow and Provost receive

- 25 -

annual salaries, a $600 monthly car allowance and a membership to the country club of their choice. Klein, Mahone, and Weiss also joined the Chemical Board following the Merger.

68.     In addition to continuing roles with Chemical, Talmer insiders secured disparate consideration as part of the Merger Agreement. Unlike the Company's public stockholders, Talmer's officers and directors had all of their stock options immediately vest, and then 25% of those options could be tendered to Talmer for a straight cash payment. This allowed Talmer insiders, at their discretion, to receive an immediate payday for such stock options rather than be forced to accept Chemical options as part of the Merger consideration.

**The Talmer Board Relies On Manipulated Financial Projections**

69.     The consideration accepted by the Talmer Board on behalf of stockholders in connection with the Merger drastically undervalued the Company and its business prospects. Based on the closing price of Chemical stock the day before the Merger was announced ($29.70), the consideration that Chemical offered was valued at just $15.64 per Talmer share. This price for Talmer stockholders: (i) represented a negative premium of 16.4% to and is almost $3 below Talmer stock's recent market high of $18.71 per share on December 29, 2015; (ii) was below the 52-week average of $16.26 per share; (iii) was negative premium of 2.3% from the

- 26 -

Company's closing price of $16.00 per share on the day before the Merger was announced; and (iv) was dramatically lower than analysts' high and median price target of $21.00 per Talmer share. However, by allowing KBW to use watered down financial forecasts for its valuation analyses, the Talmer Board could rubberstamp the Merger and create the impression that the consideration represented a fair price to Talmer stockholders.

70. As part of its advisory work and in preparing a fairness opinion for the Talmer Board concerning the Merger, KBW performed certain financial analyses, including a DCF analysis, that were intended to assess the value of the Company. A DCF analysis is widely used in investment banking, including in merger transactions, to assess the value of a business by projecting future cash flows and discounting them to a present value. A DCF analysis is critical in evaluating the fairness of consideration offered in a merger transaction, as it provides an intrinsic valuation based upon the target company's expected financial performance. However, as the basis for a DCF is inherently contingent upon the financial projections used for the target company's future earnings, a manipulation of those projections can result in an unreliable valuation.

71. Here, for purposes of its DCF analysis, KBW used forecasts for Talmer's earnings for 2016 and 2017, and then applied assumptions regarding future growth

- 27 -

rates to determine the remainder of Talmer's near-term cash flows.  This approach resulted in an implied value for Talmer of $13.22 per share to $21.10 per share.  Although the value of the consideration that the Talmer Board accepted in the Merger falls near the low end of that range, KBW's DCF analysis nonetheless gave the impression that consideration was still financially fair.

72.     Rather than representing Talmer's best estimates of future earnings based on the Board and management's expectations regarding the manner in which the Company would be operated going forward, the Talmer Board knew that the financial projections KBW used for its DCF analysis contained a critical flaw: ***the financial projections assumed that Talmer would suddenly abandon its well-established acquisition strategy***.

73.     As discussed in detail above, not only had Talmer's acquisition strategy consistently been a back-bone of its growth and core element of its business plan, but the Talmer management team included forecasts for future acquisitions in operating plans submitted to the FDIC.  The Form 10-K that Talmer filed with the SEC approximately one month after the execution of the Merger Agreement represented that Talmer's "strategic growth plan contemplates additional acquisitions," and the Company would "continue to evaluate opportunities to acquire additional financial institutions, including purchases of failed banks from the FDIC."  Klaeser confirmed

- 28 -

in sworn testimony given after the Talmer Board approved the Merger Agreement that the Company would have continued with its acquisition had it not been sold to Chemical.

74.     Consequently, financial projections that represented Talmer's true business strategy were readily available, but the Talmer Board chose to ignore them for purposes of approving the Merger.  By allowing KBW to use financial projections that understated Talmer's growth and earnings potential, KBW's DCF analysis produced deflated valuations and gave the false appearance that the Transaction offered a fair price to stockholders.

**THE MATERIALLY FALSE AND MISLEADING PROXY STATEMENT**

75.     On June 13, 2016, Talmer filed the Proxy Statement with the SEC in advance of the Special Meeting of Talmer stockholders on July 14, 2016 to vote on whether to adopt the Merger Agreement.  Defendants' primary message, which was repeated numerous times throughout the Proxy Statement and in bold print, was that "[t]he Talmer board of directors unanimously recommends that Talmer shareholders vote 'FOR' the proposal to approve the merger agreement."  This recommendation was essential to securing approval of the Merger from Talmer stockholders.  However, in advocating for the Merger, the Proxy Statement made materially false and

- 29 -

misleading statements and omitted materials facts in two key respects that made the Merger seem far more attractive than it really was for Talmer stockholders.

**The Disclosed Projections Assumed Talmer Would Abandon Its Acquisition Strategy**

76.     On pages 83-84, the Proxy Statement sets forth and describes the multi-year financial projections for the Company that the Talmer Board relied upon for purposes of approving the Merger.  Suggesting that these financial projections were sufficiently reliable, the Proxy Statement represents that "Talmer management prepared certain projections of Talmer's future financial performance for 2016 and 2017, which we refer to as the Talmer management projections, which contain unaudited prospective financial information with respect to Talmer on a standalone, pre-merger basis, and which were made available to Talmer's financial advisor, KBW, and to Chemical and its financial adviser, Sandler O'Neill."  In describing how KBW utilized these financial projections, the Proxy Statement represents that "Talmer senior management provided KBW with, and directed KBW to rely upon and utilize, a 8% annual net income growth rate assumption for 2018 through 2021 for purposes of the discounted cash flow analysis performed in connection with KBW's fairness opinion."

77.     On pages 81-82, the Proxy Statement describes KBW's DCF analysis for Talmer that it prepared in connection with its fairness opinion concerning the Merger.

- 30 -

For the purposes of its DCF analysis, the Proxy Statement represents that "KBW used financial forecasts and projections relating to the earnings, dividends and assets of Talmer prepared, and provided to KBW, by Talmer management, and assumed discount rates ranging from 8.0% to 12.0%." Suggesting that KBW's DCF analysis confirmed the fairness of the consideration offered to Talmer stockholders in the Merger, the Proxy Statement states that KBW's "discounted cash flow analysis resulted in a range of implied values per share of Talmer Class A common stock of approximately $13.22 per share to $21.10 per share."

78.     On pages 55-57, the Proxy Statement sets forth "Talmer's Reasons for the Merger and Recommendation of the Talmer Board of Directors." Among these reasons, the Proxy Statement identifies "the Talmer Board of Directors' views with respect to the value of the merger consideration to Talmer's shareholders," which included the evaluation of "financial forecasts and projections relating to Talmer prepared by Talmer management." As another reason for the Talmer Board approving and recommending the adoption of the Merger Agreement, the Proxy Statement identifies "the financial presentation, dated January 25, 2016, of KBW to the Talmer Board of Directors and opinion, dated January 25, 2016, of KBW to the Talmer Board of Directors as to the fairness, from a financial point of view and as of the date of the

- 31 -

opinion, to the holders of Talmer common stock of the merger consideration in the proposed merger."

79.     Through these representations, the Proxy Statement portrayed the disclosed financial projections and KBW's DCF analysis as reasonable support for the approval of the Merger by the Talmer Board and the fairness of the consideration offered by Chemical when compared with Talmer's standalone business plan. However, the Proxy Statement failed to disclose critical information that undermined each of these propositions.  Specifically, the Proxy Statement failed to state that the disclosed financial projections assumed Talmer would suddenly abandon its well-established acquisition strategy, while wholly omitting those financial projections that incorporated future acquisitions.

80.     These omitted facts were material to Talmer stockholders.   When investors are asked to consider whether to approve or reject a merger transaction, the choice boils down to one question:  Is the consideration more or less valuable than the expected value of remaining a stockholder and continuing to receive a share of the company's future earnings as a standalone business?  In making this determination, fair estimates of the company's future returns has been described by courts as "probably among the most highly prized disclosures by investors" and as "clearly material information."  Defendants at least implicitly acknowledged the materiality of

the projections in the Proxy Statement itself.  Two of the separate bullet-point paragraphs in the section entitled "Talmer's Reasons for the Merger and Recommendation of the Talmer Board of Directors" concern the consideration of the Company's financial projections and KBW's corresponding DCF analysis using Talmer's financial projections.

81.    The omission of the financial projections that incorporated Talmer's acquisition strategy and the concealment of the fact that the disclosed projections assumed a drastic departure from the Company's actual business plan, *i.e.*, that the Company would make no acquisitions, made several statements in the Proxy Statement materially misleading.  As noted above, the Proxy Statement conveyed the "unanimous[] recommend[ation]" of the members of the Talmer Board that stockholders vote in favor of the Merger, and that the Talmer Board evaluated "financial forecasts and projections relating to Talmer prepared by Talmer management" and the "the financial presentation" from KBW when evaluating the fairness of the consideration offered by Chemical.

82.    Based on these representations, a reasonable Talmer stockholder would have believed that the Talmer Board was evaluating financial projections and a DCF analysis that reflected the Company's operative business strategy, which had been consistently touted in SEC filings for years leading up to the Merger.  Because the

- 33 -

Proxy Statement omitted the fact that the disclosed projections did not reflect the Company's actual business strategy or financial prospects, and instead excluded acquisition-based growth, these statements statement was materially misleading.

83.    On July 7, 2016, Talmer filed a Form 8-K (the "Supplemental Disclosure") with the SEC that purported to act as a supplement to the Proxy Statement.  The Supplemental Disclosure indicated that it was modifying to the "Background of the Merger" section on pages 53-54 of the Proxy Statement to add the following language:

> Talmer's FDIC approved business plan and supplements contained business plans and strategy at the Talmer Bank level through the period ending December 31, 2016, including one scenario that included an assumed acquisition by Talmer in the fourth quarter of 2016.  As of January 2016, the consolidated Talmer projections provided by Talmer management to KBW did not assume the existence of a fourth quarter of 2016 acquisition as previously contemplated as a possibility by Talmer because the Board and management did not believe that such acquisition was probable at that time.

84.    The Supplemental Disclosure failed to cure the misleading representations in the Proxy Statement for several reasons.

85.    *First*, the Supplemental Disclosure concerned only "one scenario" from business plans Talmer provided to the FDIC and contemplated the Company completing an acquisition during the second half of 2016.  The Supplemental Disclosure did not advise Talmer stockholders that no acquisitions were incorporated

- 34 -

into any portion of the forecast period for the financial projections set forth in the Proxy Statement. A reasonable stockholder would have believed that the Supplemental Disclosure concerned only a specific acquisition opportunity and not that the disclosed financial projections assumed a total abandonment of Talmer's acquisition strategy going forward.

86. **Second,** the Supplemental Disclosure still failed to provide Talmer stockholders with a set of financial projections that properly incorporated the Company's acquisition strategy and that could be used to fairly evaluate the consideration offered in the Merger against Talmer's future prospects as an independent business. By only disclosing financial projections that understated Talmer's growth prospects, as well as KBW's depressed valuations based on those projections, Talmer stockholders were misled into voting in favor of the Merger.

87. **Third**, the Supplemental Disclosures were filed with the SEC (not mailed to stockholders) just seven days before the Special Meeting days and 24 days after the Proxy Statement was both filed with the SEC and mailed to stockholders. Critically, Talmer stockholders were permitted to vote on the adoption of the Merger Agreement in advance of the Special Meeting by voting online or mailing in their proxy cards. In fact, in his cover letter accompanying the Proxy Statement, Provost advises Talmer stockholders: "Your vote is very important. We urge you to vote your shares now

- 35 -

1456406_1

whether or you expect to attend the Talmer special meeting in person."  Provost's cover letter further states: "Voting by the Internet is fast and convenient, and your vote is immediately confirmed and tabulated.  You may also vote by completing, signing, dating and returning the accompany proxy card in the enclosed self-addressed, stamped envelope furnished for that purpose."  Thus, whether the Supplemental Disclosure was even effective is a disputed issue of fact.

88.    The misleading statements and omissions regarding the pessimistic projections, in turn, caused stockholders to believe that the Merger was more attractive, relative to Talmer remaining independent, than it truly was, and thus caused them to mistakenly approve the Merger.  By disregarding Talmer's acquisition plan for purposes of its financial projections, KBW was able to perform financial analyses based on those projections which implied that the Merger consideration was within the range of fairness.  Had KBW been required to use financial projections that were consistent with the Company's actual strategy of growing through acquisitions, it likely would not have been able to opine that the Merger price was fair, and even if it did so opine, stockholders would not have shared that conclusion and would not have supported the Merger.

**The Talmer Board Was Unaware that KBW Had Advised Chemical
on a Transaction With Talmer Before Approving the Merger**

89.     On pages 45-46, the Proxy Statement discusses two meetings between
KBW and Chemical in July 2015 (the "July Meeting") and October 2015 (the
"October Meeting"), respectively, that concerned a potential transaction between
Talmer and Chemical.

90.     Regarding the July Meeting, the Proxy Statement represents: "On July
21, 2015, KBW attended a Chemical Board of Directors meeting regarding a strategic
options review given KBW's prior investment banking services engagements and
familiarity with Chemical."   As to the substance of the July Meeting, the Proxy
Statement states: "With Talmer's knowledge and approval and in line with the Talmer
Strategic Initiatives Committee's direction to KBW to continue outreach efforts to
Chemical and certain other institutions, one of the numerous examples of potentially
available options for Chemical discussed by KBW was a potential merger with
Talmer, which was addressed during a brief portion of KBW's discussion with the
Chemical Board of Directors."   In this respect, the Proxy Statement adds: "KBW
provided information regarding a potential merger with Talmer, including strategic
rationale, transaction structure considerations and illustrative potential pro forma
financial impacts of a hypothetical merger."

- 37 -

91.     Regarding the October Meeting, the Proxy Statement represents: "In early October 2015, with Talmer's knowledge and approval, KBW provided updated information to Chemical regarding a potential merger between Chemical and Talmer for purposes of facilitating Chemical management's preparation for a meeting of the Chemical Board of Directors on October 20, 2015."  As to the substance of the meeting, the Proxy Statement indicates: "Consistent with discussions to date between Chemical's and Talmer's respective managements, which had not advanced to negotiation of the merger consideration, the information was focused on addressing the potential strategic rationale for a merger, including industrial logic, pro forma branch footprint and the loan and deposit portfolios of each institution and on a combined basis.  The information also addressed transaction structure considerations and the potential financial viability of the merger for both parties, including illustrative potential pro forma financial impacts of a hypothetical merger."

92.     These representations from the Proxy Statement indicate that Talmer was aware of and expressly authorized KBW's participation in the July Meeting and the October Meeting.  Such representations are misleading at best and false at worst.  As it became public through the state court litigation concerning the Merger, Klein – who was not just a Talmer director but also a member of the Strategic Initiatives Committee – could not confirm when repeatedly asked during two separate

- 38 -

depositions that he was ever expressly notified that KBW had advised Chemical on a potential transaction with the Company before the Talmer Board approved the Merger.  Indeed, the Talmer Board or the Strategic Initiatives Committee providing such consent would have been nonsensical.  Talmer retained KBW to advise on a potential sale of the Company, KBW was contractually bound to represent the interests of Talmer, and Talmer never terminated its retention letter with KBW at any point.  Consequently, the Board would thereby have been authorizing KBW to simultaneously advise a counterparty with interests directly adverse to those of the Company and its stockholders.

93.    The fact that both the Talmer Board and the Strategic Initiatives Committee were unaware that KBW had advised Chemical on a potential acquisition of Talmer at the time the Merger Agreement was approved is material information for Talmer stockholders.  KBW was directly involved in the Talmer Board's negotiations with Chemical and evaluation of the Merger, and the Talmer Board expressly identifies KBW's fairness opinion and corresponding financial analyses as a basis for approving the Merger and recommending its approval by Talmer stockholders.  If Talmer stockholders knew that KBW advised Chemical on an transaction with Talmer at key points during negotiations without the knowledge or consent of the Talmer Board, then Talmer stockholders would have questioned the reliability of KBW's

financial analyses presented to the Talmer Board and set forth in the Proxy Statement

and weighed that information differently when deciding how to vote on the Merger.

### COUNT I

### Against Talmer and the Individual Defendants for Violations of §14(a) of the 1934 Act and SEC Rule 14a-9 Promulgated Thereunder

94.     Plaintiff repeats and realleges the allegations contained above in ¶¶1-93,

as if fully set forth herein.

95.     SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to §14(a)

of the Securities Exchange Act of 1934, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

96.     Defendants prepared, reviewed and/or disseminated the misleading Proxy

Statement which failed to disclose material facts necessary in order to make the

statements made, in light of the circumstances under which they were made, not

misleading.

97.     As stated herein, the Proxy Statement contained untrue statements of

material facts and omitted to state material facts necessary to make the statements that

- 40 -

were made not misleading in violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder, and the Proxy Statement was an essential link in the consummation of the Merger.  Defendants have also failed to correct the Proxy Statement and the failure to update and correct misleading statements is also a violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

98.    The written communications made by defendants described herein constitute violations of Rule 14a-9 and §14(a) because such communications are materially misleading and were provided in at least a negligent manner.

99.    As a direct result of defendants' negligent preparation, review and dissemination of the misleading and materially incomplete Proxy Statement, plaintiff and the class were precluded both from exercising their right to seek appraisal and were induced to vote their shares and accept inadequate consideration in connection with the Merger.  The misleading Proxy Statement used to obtain stockholder approval of the Merger deprived plaintiff and the class of their right to a fully informed stockholder vote in connection therewith and the full and fair value for their Talmer shares.  At all times relevant to the dissemination of the materially misleading Proxy Statement, defendants were aware of and/or had access to the true facts concerning Talmer's acquisition-based growth strategy, which was not reflected in the financial projections contained in the Proxy Statement, and thus were aware that their

- 41 -

statements about those projections were misleading.  Thus, as a direct and proximate result of the dissemination of the misleading Proxy Statement defendants used to obtain stockholder approval of and thereby consummate the Merger, plaintiff and the class have suffered damage and actual economic losses (*i.e.*, the difference between the value of the consideration Talmer stockholders received and Talmer's true value at the time of the Merger) in an amount to be determined at trial.

100.   The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder would have considered them important in deciding how to vote on the Merger.  In addition, a reasonable investor would view a full and accurate disclosure as having significantly altered the "total mix" of information made available in the Proxy Statement and in other information reasonably available to stockholders.

101.   By reason of the misconduct detailed herein, defendants are liable pursuant to §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

## COUNT II

### Against the Individual Defendants and Chemical for Violations of §20(a) of the 1934 Act and SEC Rule 14a-9 Promulgated Thereunder

102.   Plaintiff repeats and realleges the allegations contained above in ¶¶1-93, as if fully set forth herein.

- 42 -

103.   The Individual Defendants acted as controlling persons of Talmer within the meaning of §20(a) of the 1934 Act.

(a)     By virtue of their positions as officers and/or directors of Talmer, and/or their participation in and/or awareness of the misleading statements contained in the Proxy Statement filed with the SEC, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are misleading.

(b)     Each of the Individual Defendants were provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by plaintiff to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

(c)     The Proxy Statement details the Individual Defendants' involvement in negotiating, reviewing and approving the Merger and preparation of the Proxy Statement.

(d)     The Proxy Statement contains the unanimous recommendation of each of the Individual Defendants to approve the Merger.  They were thus directly involved in the making of this document.

- 43 -

104.    By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the 1934 Act.

105.    Chemical is a controlling person of Talmer and the Individual Defendants within the meaning of §20(a) of the 1934 Act.  By reason of their contractual rights and obligations with respect to Talmer and the Individual Defendants, Chemical possessed control over Talmer and the Individual Defendants.

(a)    Pursuant to §4.11 of the Merger Agreement, Chemical agreed that "[n]one of the information supplied by Chemical for inclusion or incorporate by reference in any Transaction Document will contain any untrue statement of material fact of omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading," including in connection with the issuance of the Proxy Statement.

(b)    Pursuant to §5.2 of the Merger Agreement, Talmer and the Individual Defendants were required by to refrain from changing the operation of the Company's business or engaging in a variety of activities without the express written consent of Chemical.

(c)    Pursuant to §6.3 of the Merger Agreement, Chemical was required to "jointly prepare and cause to be filed with the SEC a joint proxy statement to be sent to the Chemical Shareholders and the Talmer Shareholders relating to the

- 44 -

Chemical Shareholder Meeting and the Talmer Shareholder Meeting." Chemical and Talmer were further required to "consult with the other Party with respect to such filings and shall afford the other Party and its Representatives reasonable opportunity to comment thereon."

106.   By reason of such conduct, Chemical is liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.     Declaring that the Proxy Statement distributed by defendants to stockholders was materially misleading, in violation of Rule 14a-9 and §14(a) of the 1934 Act;

C.     Awarding plaintiff and the members of the Class compensatory and/or rescissory damages against the defendants;

D.     Awarding plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs;

- 45 -

E.      Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, and any appropriate state law remedies; and

F.      Awarding such other relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED:  July 27, 2018                    ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                         RANDALL J. BARON
                                         A. RICK ATWOOD, JR.
                                         DAVID T. WISSBROECKER


                                         _____
                                             s/ David T. Wissbroecker
                                             DAVID T. WISSBROECKER

                                         655 West Broadway, Suite 1900
                                         San Diego, CA  92101
                                         Telephone:  619/231-1058
                                         619/231-7423 (fax)

                                         Lead Counsel for Plaintiff

                                         THE MILLER LAW FIRM, P.C.
                                         E. POWELL MILLER (P39487)
                                         MARC L. NEWMAN (P51393)
                                         950 W. University Drive, Suite 300
                                         Rochester, MI  48307
                                         Telephone:  248/841-2200
                                         248/652-2852 (fax)

                                         Local Counsel

- 46 -

VANOVERBEKE MICHAUD
  & TIMMONY, P.C.
THOMAS C. MICHAUD (P46787)
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)

Additional Counsel for Plaintiff

- 47 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on July 27, 2018, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ David T. Wissbroecker
DAVID T. WISSBROECKER

ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: DWissbroecker @rgrdlaw.com

1456406_1

# Mailing Information for a Case 1:16-cv-12229-TLL-PTM Livonia Employees' Retirement System v. Talmer Bancorp, Inc. et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Thomas M. Amon**
  tamon@wnj.com

- **Michael G. Brady**
  mbrady@wnj.com,tparrish@wnj.com

- **Joni S. Jacobsen**
  joni.jacobsen@dechert.com,nicole.ladue@dechert.com,melanie.mackay@dechert.com

- **Matthew George Mrkonic**
  mmrkonic@honigman.com,pfisher@honigman.com,Litdocket@honigman.com

- **Danielle S. Myers**
  dmyers@rgrdlaw.com

- **Marc L. Newman**
  mln@millerlawpc.com,sab@millerlawpc.com,mln@ecf.courtdrive.com,ssr@ecf.courtdrive.com,ssr@millerlawpc.com

- **David T. Wissbroecker**
  dwissbroecker@rgrdlaw.com,e_file_sd@rgrdlaw.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)